Hervie L. DANIELS and Hervie Daniels, Jr., as Co-Administrators of the Estate of Jesse DeSoto Daniels, deceased, for the use and benefit of Hervie Daniels, Sr., and Nancy Daniels, next of kin, Plaintiffs-Appellees,

v.

L. D. GILBREATH, Rickey Dennison, Maxine Fultner, Defendants,

The County of McCurtain, Oklahoma, and Dr. R. D. Garcia, Defendants-Appellants.

Americans for Effective Law Enforcement, Inc., County Sheriffs of Colorado, the Kansas Sheriffs' Association, the Oklahoma Sheriffs' Association, and the Wyoming Sheriffs' Association, Amici Curiae.

Nos. 80–1417, 80–1570.

United States Court of Appeals, Tenth Circuit.

Submitted in No. 80–1417 Oct. 16, 1981.

Argued and Submitted in No. 80–1570 Oct. 16, 1981.

Decided Jan. 13, 1982.

478

Charles S. Rogers, Asst. Atty. Gen., Oklahoma City, Okl. (Jan Eric Cartwright, Atty. Gen. of Okl., and Manville T. Buford, Oklahoma City, Okl., with him on the briefs), for defendant-appellant Dr. R. D. Garcia.

Don Shaw, Dist. Atty., Idabel, Okl., on the brief for defendant-appellant County of McCurtain, Okl.

Frank M. Hagedorn of Hall, Estill, Hardwick, Gable, Collingsworth & Nelson, Tulsa, Okl., for plaintiffs-appellees.

Wayne W. Schmidt, South San Francisco, Cal., Fred E. Inbau, Chicago, Ill., and James P. Manak, Glen Ellyn, Ill., on the brief, for amici curiae.

Before DOYLE, BREITENSTEIN and McKAY, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

The judgment which is here being appealed from was entered against McCurtain County, Oklahoma, Dr. R. D. Garcia, and the former sheriff of McCurtain County, Sheriff Gilbreath. Damages were awarded to the decedent's parents growing out of his death while in the Eastern State Hospital at Vinita, Oklahoma. He had been a prisoner in the McCurtain County jail, awaiting trial. He was referred to the Eastern State Hospital for the purpose of a pre-trial diagnosis of his mental condition. The decedent died soon after arriving at the hospital. Suits were filed in the District Court for the Eastern District of Oklahoma. Judgments were entered against Sheriff Gilbreath in the amount of $25,000, against McCurtain County, Oklahoma for $25,000 and against Dr. R. D. Garcia in the amount of $50,000. It is to be noted that Sheriff Gilbreath did not join in this appeal and did not file a brief, of course. As to him, the problem arises as to whether his case should be decided nonetheless since his position has been indicated in this case.

Jesse DeSoto Daniels died on August 4, 1976 in the Oklahoma Eastern State Hospital. He had been arrested by the Idabel, Oklahoma police on July 25 for the assault and robbery of an elderly woman. Following arrest he was taken to the Idabel City jail. While there, Daniels' father attempted to visit him and brought Jesse a tranquilizer known as Sinequan in an unmarked container. This drug had been prescribed

for Jesse's use several days before his arrest. Following his arrest he was transferred to the McCurtain County jail. It was discovered that Daniels was not receiving the tranquilizer. This was due to the fact, so the jailers said, that it was in an unmarked container; the county jail would not administer the substance. Daniels' father was notified and brought to the jail a properly marked prescription of Sinequan. There was contradictory evidence at the trial as to whether Daniels received any of the tranquilizer while in the county jail. Daniels received no medical attention while he was in the county jail. It is said that he screamed for his father on more than one occasion and the Sheriff asked the District Attorney to seek a court order for psychiatric evaluation of Daniels in order to determine his competence to stand trial. The Sheriff allowed Daniels' father to take custody of his son on August 3rd and to transport him to the state hospital on August 4th.

Jesse Daniels, the deceased, was upon arrival interviewed by Dr. Garcia. On that occasion Daniels' father, Hervie L. Daniels, testified that he told Dr. Garcia that Jesse needed the Sinequan that he had brought along. According to the elder Daniels, Dr. Garcia walked away from Daniels before he was able to tell the doctor that Jesse had an allergic reaction to Stelazine or Thorazine six years before. The record is not clear as to which it was. Mr. Daniels also testified that he wished to tell the doctor that Jesse had had an allergic reaction to "some medicine." Stelazine is a phenothiazine in the same class of drugs with Serentil, the drug administered to Jesse just before his death. The decedent, after his conversation with Garcia, was taken to a room in the hospital and given pencil and paper for the purpose of completing a test. At that time he became very noisy and the staff had to subdue him. Jesse was a good sized man, he was around six feet tall and weighed close to 200 pounds and it took three or four of the personnel to quiet him. At that time Dr. Garcia ordered an injection of Serentil for Jesse. This is a phenothiazine used to control psychosis. In a matter of minutes after this injection Jesse Daniels died. The autopsies did not disclose the cause of death.

The plaintiffs' theory of the case is that McCurtain County and Sheriff Gilbreath had deprived Daniels of his due process rights under the fourteenth amendment and had administered cruel and unusual punishment to him in violation of the eighth amendment. Further, it is their contention that these constitutional violations led to Daniels' death and were the result of their failure to administer the tranquilizer Sinequan to the decedent and failure to provide adequate medical care at the jail leading to his transfer to the state mental hospital. As to Dr. Garcia, his unwillingness to listen to the decedent's father about Jesse's medical history evidenced, so they maintain, a deliberate indifference to the serious medical need of Daniels and thereby violated his eighth and fourteenth amendment rights. The argument is that if Dr. Garcia had known of the allergy, he may not have administered the Serentil. So, the theory is that Daniels lost his life and the survivors were damaged as a direct and proximate result of the actions of the defendants.

### THE CONTENTIONS ON APPEAL

McCurtain County and the sheriff are blamed for causing the death of the decedent. Their contention is that they were far removed from his death and that the evidence as to them is insufficient. Similarly, Dr. Garcia maintains that the evidence is insufficient from his standpoint as well. Garcia maintains that the evidence was legally insufficient to prove (a) the violation of any constitutionally protected rights of Jesse Daniels or (b) a causal relationship between the acts or omissions of Dr. Garcia and the death of Jesse Daniels. We are saying that there is a complete lack of evidence to establish responsibility on the part of the sheriff and the county for the death of Jesse Daniels. Thus, there were intervening acts subsequent to the time that Jesse Daniels left the jail which render their actions legally remote causes—causes which in both fact and in law do not qualify

as proximate causes. The trial court should have directed verdicts for both the county and for the sheriff.

### The Legal Status of the Sheriff

While on the subject of the former Sheriff of McCurtain County, L. D. Gilbreath, we must point out that although the sheriff did not appeal on his own behalf, an organization, The Americans for Effective Law Enforcement, Inc., did file a brief on his behalf and on behalf of McCurtain County. They urge in that brief that our conclusions in appeal No. 80–1470 should apply to the non-appealing party, Sheriff Gilbreath. Ordinarily a non-appealing party cannot gain benefit from a successful appellate decision reversing a trial judgment rendered against him. *See Cook & Sons Equipment v. Killen*, 277 F.2d 607 (9th Cir. 1960); 9 J. Moore's Federal Practice, ¶ 1201.44[4], (2d ed., 1980). Inasmuch as we have concluded that neither the county nor the sheriff is liable as a matter of law, it makes no sense to allow the judgment against the sheriff to stand. The position which we take is consistent with *In re Barnett*, 124 F.2d 1005, 1009 (2nd Cir. 1942), wherein it was held that a non-appealing party could benefit from an appellate decision when reversal "wipes out all basis for recovery against the non-appealing, as well as against the appealing defendant." *See Kicklighter v. Nails by Jannee, Inc.*, 616 F.2d 734 (5th Cir. 1980); *Maryland Casualty Company v. City of South Norfolk*, 54 F.2d 1032 (4th Cir. 1932). *Cf. Hegger v. Green*, 646 F.2d 22 (2nd Cir. 1981) (acknowledging In Re Barnett but distinguishing it where the non-appealing party can still be liable). A law does not hold a man responsible for every consequence however remote in time and in circumstances.

The activity of the sheriff here, and indeed of the county, is far removed in time and space from the activity associated with the death of Jesse Daniels. We fail to see how it could be argued that the sheriff had anything to do with the death of Daniels. The argument on behalf of the plaintiffs is that if the sheriff and his deputies had given the medication that was offered at the jail prior to the transfer to the hospital, there would not have been a problem. However, this can hardly be regarded as a cause in law, or for that matter in fact. They are successive events but undoubtedly Jesse would have had to have been transferred to the hospital for the purpose of an examination in all events, regardless of whether he was given medication in the jail. The events subsequent to jail could not possibly have been foreseen from that vantage point. *See Johnson v. Duffy*, 588 F.2d 740, 743–44 (9th Cir. 1978).

Inasmuch, then, as it appears to be undisputed that Sheriff Gilbreath could not under any circumstances have foreseen the turn of events at the hospital and prevented them, there is no justification whatsoever for concluding that there is a legal basis for submission of his case to the jury.

### The Applicable Law

As noted above this action has arisen under 42 U.S.C. § 1983. The essence of this statute, which is a post Civil War one, is that every person who under color of state law subjects any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and laws, is liable to the party injured in an action at law set in equity or other proper proceeding. Thus, the basis of the remedy under this statute is the Constitution of the United States although it is sometimes said that it is a tort action. If so, it is a constitutional tort. *See Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), overruled on other grounds in *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). As a quasi-tort action, a showing of proximate cause is one of the requirements. This court has recognized that it is a requirement in *McClelland v. Facteau*, 610 F.2d 693 (10th Cir. 1979). The cases have generally recognized to the extent that the question has come up, that proximate cause is an essential aspect of the § 1983 action. *Arnold v. International*

Business Machine Corp., 637 F.2d 1350, 1355 (9th Cir. 1981). We are not speaking merely to factual cause, rather our reference is to legal causation which goes to relationship to the injury and consequent liability. *Rheuark v. Shaw*, 628 F.2d 297 (5th Cir. 1980), *cert. denied sub nom., Rheuark v. Dallas County*, 450 U.S. 931, 101 S.Ct. 1392, 67 L.Ed.2d 364 (1980). The Supreme Court in its decision in *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) recognized that the tort rules defining elements of damages and the prerequisites for the recovery of damages provide the appropriate starting point for the inquiry under § 1983 as well. *Id.* at 257–58, 98 S.Ct. at 1048–1049. *See also, Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 409, 91 S.Ct. 1999, 2011, 29 L.Ed.2d 619 (1970), (Harlan, J. concurring).

### *The Issue of Liability of Dr. Garcia*

The argument of Dr. Garcia, the main one, is that the evidence presented was insufficient to justify the case going to the jury.

The first inquiry is the test or governing principle which is to be applied to the medical fact situation revealed by the evidence.

The claim against Dr. Garcia is predicated on alleged deliberate indifference to the serious medical needs of Jesse Daniels. This test or formula derives from the Supreme Court's decision in *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) wherein the Court held that such a claim under § 1983 by a prisoner is cognizable. In *Estelle* this kind of claim was held cognizable under the eighth amendment. The identical claim can be presented under the fourteenth amendment, *see Rhem v. Malcom*, 507 F.2d 333, 337 (2nd Cir. 1974).

In *Estelle v. Gamble* an inmate brought a civil rights action under § 1983 against the State Corrections Department, medical director and two corrections officials, claiming that he was subjected to cruel and unusual punishment under the eighth amendment. In his complaint the plaintiff alleged that he had suffered an inadequate treatment for a back injury sustained while he was engaged in prison work. The district court dismissed the complaint for failure to state a claim under which relief could be granted. The court of appeals held that the insufficiency of medical treatment required reinstatement of the complaint. The Supreme Court's ruling was that deliberate indifference by prison personnel to a prisoner's serious illness or injury constitutes cruel and unusual punishment contrary to the eighth amendment. The Court further held that the respondent in the *Estelle* case had not come forward with proof of such indifference. The medical director and other medical personnel had seen respondent on seventeen occasions during a three month span and had treated his injury and other problems. The failure to perform an x-ray or to use additional diagnostic techniques did not constitute deliberate indifference by prison personnel and was held not to constitute cruel and unusual punishment. It was determined to be at most medical malpractice and was cognizable in the state courts. The question of whether the respondent had stated a constitutional claim against the other petitioners was not separately evaluated by the court of appeals and the Court held it should be considered on remand.

In the course of its opinion in *Estelle* the Supreme Court stated:

> We, therefore, conclude that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia, supra* [428 U.S. 153], at 173 [96 S.Ct. 2909, at 2925, 49 L.Ed.2d 859], proscribed by the eighth amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoners' needs or by prison guards in intentionally denying or delaying access to medical care, or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states the cause of action under § 1983.

429 U.S. at 104–05, 97 S.Ct. at 291.

The Court made clear that the conclusion reached did not mean that every claim by a

prisoner that he had not received adequate medical treatment states a violation of the eighth amendment. An accident, although it may produce added anguish, is not, on that basis alone, to be characterized as a wanton infliction of unnecessary pain. The Court cited *Louisiana ex rel. Francis v. Reswebber*, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422, wherein it was concluded to be constitutional to force a prisoner to undergo a second effort to electrocute him after a mechanical malfunction had thwarted the first attempt. The reasoning was that the second execution was not violative of the eighth amendment because the first attempt was an unforeseeable accident. The conclusion was that:

> Similarly in the medical context an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind."

The Supreme Court added that:

> [A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the eighth amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, the prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the eighth amendment.

429 U.S. at 105–06, 97 S.Ct. at 291–292.

In *Estelle*, as in our present case there is not any failure to give medical attention. Gamble was held to have been given ample attention by all of the staff. His back injury was treated as was his high blood pressure and heart problems. The Court pointed out that the complaint was not failure to give him treatment, but was based solely on the lack of diagnosis and inadequacy of treatment of his back injury. He complained that he was not x-rayed. It was said that a medical decision to not order an x-ray does not represent cruel and unusual punishment. At most it is medical malpractice and as such the forum is the state court unless malpractice has been included as a pendent claim.

It was held that "the court of appeals was in error in holding that the alleged insufficiency of the medical treatment required reversal and remand. That portion of the judgment of the district court should have been affirmed." *Id.* at 107–08, 97 S.Ct. at 292–293.

The *Estelle* case has made clear that deliberate indifference to serious medical needs is necessary in order to have a semblance of a § 1983 case. The Court distinguishes between inadvertent failure to provide medical care and a deliberate indifference to serious medical needs. It is only the latter that can form the basis for an action of the nature that we are here considering.

With that standard in mind we must now consider the facts in some detail in order to properly evaluate the instant problems.

### Analysis of the Facts Which Pertain to the Admission and Treatment of Jessie Daniels Leading to his Death

Hervie Daniels, the father, and his son Jesse arrived at the hospital at 3:00 p. m. on August 4, 1976. Daniels checked in at the admissions building, then took Jesse to the Ten Building, maximum security, where Dr. Garcia was working. Dr. Garcia was shown to have been the chief forensic psychiatrist at the hospital and he had a considerable staff working under his direction. Mr. Hervie Daniels brought the Sinequan that had been prescribed for Jesse and asked for the doctor in charge and Dr. Garcia responded. Mr. Daniels told Dr. Garcia that Jesse was to take the Sinequan; that Jesse had been arrested and was acting disorderly in the jail and that the court had ordered mental observation. Jesse's father gave Dr. Garcia the bottle of Sinequan that he had brought along. Daniels talked to Dr. Garcia for about three minutes. Garcia left Hervie standing in the hospital building before he had a chance to tell Dr. Garcia that Jesse had an allergy to some medicine. Hervie

testified that Thorazine was the drug Jesse was allergic to. Hervie testified that he had stayed around the foyer for five or ten minutes hoping the doctor would come back and continue the conversation. Before the conversation between Daniels and Dr. Garcia began, Jesse had been escorted upstairs to be examined and at that time did not appear to be exhibiting any disruptive behavior.

At the trial Hervie testified that Jesse had previously received psychiatric care in South Carolina but this was not communicated to Dr. Garcia. Also the information was communicated that Jesse had had a negative reaction to medication (probably Thorazine) while he was living in Pennsylvania five or six years before his death. Jesse's sister testified at the trial that he had had a reaction to a phenothiazine drug while he was living in South Carolina and this was described as extrapyramidal in nature, i.e., his neck extended back and to the side and his mouth took on a contorted look.

Steve Willy, a social work assistant, who had been present when Dr. Garcia interviewed Jesse Daniels on the fourth floor of the hospital, testified regarding Jesse's struggle with the attendants. Jesse had been given a shower and put in pajamas before he was brought to Dr. Garcia. The interview with the doctor lasted between fifteen and twenty-five minutes and Jesse complained on several occasions that he was hungry. Afterwards he was put in his room on the fourth floor and Steve Willy walked by his door, looked through the window and observed him with his back to the door, arms outstretched talking to himself. As Dr. Garcia and Willy were waiting in the fourth floor lobby for the elevator, Jesse began to pound on his door. Willy observed aides come to Daniels' room, open the door and struggle with Daniels on the floor just outside his room. The nurse, Maxine Fultner, went to help out and Willy saw her giving what he assumed was mouth to mouth resuscitation to Daniels. He did not see the nurse inject Jesse with anything.

Larry Couch, an attendant, had some participation in the struggle. His testimony was that he was assigned to supervise Daniels' shower; he observed Jesse jumping around in the shower, talking to himself by yelling and mumbling. Couch saw Dr. Garcia interview Daniels; he estimated that the interview took five minutes. Couch testified that he saw another attendant take the hospital's standard psychological test and a pencil to Daniels in his room after the interview. Couch heard Daniels yell from his room repeatedly that he wanted to eat. He was told the food cart would be along shortly. When Daniels did not stop yelling, the attendant, Don Rowe, opened Daniels' door and at that time Couch saw Daniels charge out of the room and attempt to stab Rowe with a pencil. Rowe struggled with Jesse and Couch entered the fracas too. An attendant ran and got leather cuffs and belt to restrain Daniels and put him on his bed. After Couch and two other attendants got the restraints on, they lifted Daniels to his bed and he quit fighting. Couch did not see anyone give Daniels an injection. He testified that it took three attendants to hold Daniels to the floor and he was still struggling when they lifted him to his bed. Apparently he died seconds after he was put on the bed. Nurse Fultner gave Daniels resuscitation, oxygen and heart massage.

Tony Ray Minson, another attendant on duty at the time, also testified concerning his participation in subduing Daniels. Minson witnessed the interview between Garcia and Daniels and he said it lasted fifteen minutes. Minson corroborated Couch's testimony concerning Daniels' coming out of the door of his room yelling and fighting. At that time Minson ran for the restraints and assisted the others in applying them. He saw Nurse Fultner give Daniels an injection in the hip. After this injection Jesse went limp momentarily and then began fighting. Once Daniels got the injection and the restraints were secured he was immediately taken to his bed. Daniels was still struggling when he was placed on his bed. It was Minson's estimate that a few minutes after the injection was received, Daniels died.

Dr. Garcia was the next witness; the transcript shows only direct testimony by the doctor. He confirmed that Jesse's father told him while in the lobby of the building that Jesse had a prescription for Sinequan, an anti-depressant, to be administered twice a day and that Jesse needed the medication. He asserted that Hervie Daniels did not mention to him any allergy Jesse had to the phenothiazine group of drugs. Garcia only looked at Jesse at a glance while he was in the lobby of the building. Garcia testified he interviewed Daniels for approximately thirty minutes when Daniels was brought to the fourth floor where his room was. After his shower, he was given pajamas and an aid took his vital signs: blood pressure, heart rate, pulse, respiration and weight. After these were taken Jesse was sent to Dr. Garcia to be interviewed. Garcia asked about his past usage of anti-psychotic drugs like Thorazine and Jesse denied having had an allergic reaction in the past. Garcia testified that while he was interviewing Daniels, the decedent stood up and shouted the Lord's Prayer and the Pledge of Allegiance; he said he was grinning inappropriately. Dr. Garcia then wrote on Daniels' chart that he was ordering Serentil for Daniels to calm him. A discrepancy exists between Garcia's deposition and his courtroom testimony as to whether Dr. Garcia got any psychiatric history from Jesse's father. Garcia made a professional judgment that he would not continue Daniels on the Sinequan. Daniels was excited and agitated but not depressed which is the indication for Sinequan. Garcia's progress notes taken during the interview concluded with no diagnosis but a suspicion of possible schizophrenia or alcoholism.

Garcia witnessed Daniels being subdued by the attendants. He attempted to calm him and ordered an injection of 50 mg. intramuscular Serentil. After that the doctor went downstairs in the elevator but returned almost immediately because he was paged to the effect that Daniels was apparently dying on his bed and resuscitation efforts had begun. Garcia corroborated Willy's statement that Daniels was making lots of noise in his room and when his door was opened he struggled with the attendants. The doctor was asked by plaintiffs' counsel if, had he known beforehand of Daniels' previous allergic reaction, would he have still given Daniels Serentil. Dr. Garcia answered in the affirmative. Daniels' previous reaction, the stretched neck and the distorted facial expression, was only a side effect and not a contraindication for the phenothiazine group of drugs.

### Summary of Medical Testimony

*Dr. Thomas Whitsett* was presented by Dr. Garcia. His specialty was described as internal medicine together with clinical pharmacology. He was shown to be connected with the University of Oklahoma College of Medicine and the Veterans' Administration.

On direct examination Whitsett testified about the drug Sinequan, the anti-depressant that Jesse Daniels had been taking prior to his arrest and, possibly, while he was being held in jail. The doctor gave the opinion that Sinequan should not be given for symptoms of restlessness and inability to sleep, the very reason that it was prescribed for Daniels. Sinequan is indicated for depression, especially where one has anxiety. Daniels had been described as hyperactive, agitated, and combative in the McCurtain County jail and at the hospital and should not, according to Dr. Whitsett, have been taking Sinequan for those symptoms. He gave his opinion also that the stopping of the administering of Sinequan would not contribute to his excited behavior.

Dr. Whitsett testified extensively as to side effects and contraindications of Serentil, the drug which was given to Daniels before he passed away. Dr. Whitsett said that the presence of extrapyramidal symptoms, distonia or an opisthotonus reaction to the phenothiazine drugs (of which Serentil is one) were unrelated to a propensity for an anaphylactic reaction. Some explanation was given regarding this. The doctor said that all three of these possible reactions to the phenothiazines are forms of

contractions of muscles and distortions of body positions. There was testimony that in 1970 or 1971 Jesse had an extrapyramidal reaction to Thorazine or Stellazine. The plaintiffs have based their theory of his death on the speculation that the injection of Serentil that he received caused an allergic reaction known as anaphylactic shock, a form of shock which causes an inability to adequately breathe, swelling of vocal chords and an asthma-like reaction. The plaintiffs' theory has been that if Jesse went into anaphylactic shock while struggling on the hospital floor outside his room and being held face down, that he may have suffocated by the time the attendants put him on the bed. Thus the defense asked Dr. Whitsett if there could have been any correlation between Jesse's past reaction to the phenothiazine drugs and a susceptibility to anaphylactic shock.

It was said by Dr. Whitsett that Serentil is indicated for control of acute or chronic psychosis and that it is only contraindicated in someone who is depressed or comatose. There was no particular testimony that Daniels exhibited either condition. The known adverse side effects include the extrapyramidal symptoms, dizziness and breast engorgement. These side effects are not absolute contraindications for Serentil. Dr. Whitsett knew of no allergic reactions occurring from the use of Serentil. Dr. Whitsett was unable to recall in any of the literature that he knew of a case where a patient had a life-threatening or fatal reaction to Serentil. He was unaware of any studies that showed a single dose of Serentil to be associated with a higher incidence of sudden death. The testimony adduced, however, was that people with schizophrenia or other chronic psychoses are at a greater risk of sudden death than someone who is mentally healthy.

During cross-examination of Dr. Whitsett he was asked to keep in mind that Serentil is contraindicated for the depressed patient and to assume for a moment that Jesse was depressed, then could Serentil have caused sudden death in a depressed person? His response was that he did not think it likely since Serentil was contraindicated for the

depressed because it was of no value to their condition. Dr. Whitsett was also asked at cross-examination that *assuming* Jesse went into anaphylactic shock from the Serentil injection, could he die from this reaction. The doctor responded that if left unattended, that such a patient would die and could die within three minutes if he went into anaphylactic shock. If a person is in this kind of shock and is being restrained, this would aggravate the chance for recovery.

Dr. Whitsett was asked if he had known of a patients' past history of muscle rigidity from a drug would he have done other things before administering. The doctor responded "not necessarily." The rigidity is not a contraindication for the drug's use. Whitsett did not consider acute use of a phenothiazine under the facts of this case a dangerous drug per se. Dr. Whitsett was then asked to assume two other possible causes of death. If a patient was having a distonic reaction to a drug, that is muscle rigidity, and was held down, could he be asphyxiated? The answer was not if his diaphragm was functioning normally. If the doctor had knowledge of the patient's prior extrapyramidal reaction, he was asked, would this indicate a propensity to cardiac arrhythmia? The answer which he gave was no.

Daniels was given oxygen just prior to his death and also cardio-pulmonary resuscitation and artificial respiration. Whitsett said that this was proper treatment for anaphylactic shock.

*Dr. O. W. DeHart* was called to Eastern State Hospital after Daniels was pronounced dead. He found discrepancies between what he was told by the staff on August 4, 1976 (the date of Jesse's death), and a report Dr. Garcia prepared which he saw on September 22nd. The discrepancies were that in August no one told Dr. DeHart that Jesse had been unruly in his room and had attacked an attendant with a pencil. Dr. DeHart was told that the disturbance started in the hall. On August 4th Dr. DeHart did not remember seeing several

entries in the medical charts that he found on the twenty-second involving orders to check Daniels' blood pressure for three days, watch for explosive behavior and give Serentil 50 mg. intramuscular every four hours.

Dr. DeHart found no gross evidence of asphyxiation, suffocation or strangulation. Nor was there evidence that Dr. Garcia did not respond immediately when advised that Daniels was in distress. DeHart was not told by anyone that the emergency care ordered for Daniels to try and revive him was not ordered immediately upon the discovery of Daniels' condition. DeHart further testified that he would have taken the same steps to save Daniels when he stopped breathing except for the giving of Coramine. But whether to use Coramine to revive someone as opposed to another drug was purely a question of medical judgment. Everyone that DeHart questioned told him the same story, that Daniels became violent and combative and had to be wrestled to the floor.

Dr. DeHart testified that even if on August 4th he had been advised that the altercation with Daniels started in his room and he charged out and attacked the attendant with a pencil, this would have made no difference to the subsequent handling of the case. DeHart ordered the autopsy and investigation into Daniels' death because of the curious circumstances. Because of the discrepancy between the chart on August 4th and September 22nd, the county reinvestigated the case and even exhumed Daniels' body to do a second autopsy.

*Dr. Robert Fogle*, who reviewed records and slides of the autopsies, said that the autopsy did not show Serentil or Coramine in the body at the time of death. Fogle concluded that his opinion as to cause of death was a strong possibility of asphyxiation. He made this statement based on the absence of other forms of sudden death; this led him to the asphyxiation deduction. The defendant objected and the court admonished counsel that "possible" is not proper evidence. The court told plaintiff's counsel "that is really speculative, Frank."

Fogle refused to say anything stronger than "possible." Fogle testified that a person could have an anaphylactic reaction to Serentil; there are reports, but they are most unusual. Fogle further testified that the appropriate protocol was followed in doing the autopsies. Fogle agreed with Dr. Hoffman, who did the autopsies, that cause of death is unknown and undetermined.

*Dr. Neal Hoffman*, pathologist and assistant medical examiner of Oklahoma, did the autopsies on Daniels. He was deceased at the time of trial and his deposition was read into the record.

There was no showing of significant disease or injury in Daniels' body and the toxicology work-up was negative, i.e., no drugs were found in his blood or liver. Hoffman performed the second autopsy because the medical records showed the Serentil injection but the first autopsy showed no evidence of drugs. Dr. DeHart reported that Daniels was found dead ten minutes after the injection, but the medical records showed that he was found one minute after receiving the shot. After a second autopsy Dr. Hoffman changed his initial cause of death determination from acute psychosis to unknown. No drugs were found in specific sites on Daniels' body where puncture marks or abrasions were found. Hoffman found none of the general signs associated with an allergic reaction. He said that there are cases of allergic reaction death without evidence of specific anatomical signs. He found injection marks on Daniels' neck which the record did not mention. The record said that Daniels had been injected antemortem on the right deltoid, but Hoffman found no evidence of this. The Serentil had been injected into one hip, but Hoffman found bruises on both hips indicating they both could have received injections. Hoffman ruled out trauma, physical violence and strangulation as possible causes of death. Dr. Hoffman added that he was unfamiliar with any literature saying that Serentil could be a cause of death.

## ANALYSIS OF THE APPLICABLE FACTS AND THE LAW

We have detailed the facts only because that is the only acceptable background for

determining whether there are facts in the record which are of such a character as to establish the violation of § 1983. Thus were the civil rights of the decedent violated. We have considered, in addition to *Estelle v. Gamble*, other decisions of the circuits and of the Supreme Court as well. For example, *Gregg v. Georgia*, 428 U.S. 153, 169–173, 96 S.Ct. 2909, 2923–2925, 49 L.Ed.2d 859, says that the prisoner, being unable to take care of himself, must depend on receiving treatment from his jailers. Based upon this relationship the deliberate indifference rule has emerged. Thus deliberate indifference to a prisoner's serious illness or injury states a claim under § 1983. The question which we must decide is whether there is evidence in this case that satisfies this standard. In *Estelle v. Gamble* it was pointed out that this tort, if it is a tort, is quite different from medical malpractice. These are similar, however they are not coterminous in their application.

The malpractice case is a species of ordinary negligence, whereas the § 1983 case is one which is of constitutional dimension. To have a § 1983 case it is not sufficient to show that a physician has exposed a person to an unreasonable risk of harm or simple negligence. It must appear that there has been a violation of a constitutional or fundamental right guaranteed by the fourteenth amendment or perhaps of the eighth amendment incorporated into the fourteenth.

### The Charge to the Jury

The trial judge recognized the distinction mentioned above. He gave the definition of cruel and unusual punishment as being that which is so severe under the circumstances as to shock the conscience of a reasonably prudent man, which amounts to clear abuse. The judge continued that Jesse Daniels as a result of living under the protection of the Constitution, had the legal right at all times not to be deprived without due process of law of his life as secured or protected to him by the Constitution or laws of the United States; that to be deprived of life without due process of law means to be deprived of life without authority of the law.

Instructions also dealt with the duty of the government, state or county, through its officials to provide necessary and adequate medical care for the serious medical needs of its prisoners. The court told the jury that the denial of medical care would under certain circumstances constitute cruel and unusual punishment or denial of life without constitutional due process of law. Then the judge said that for the defendant to be held liable for denying a prisoner adequate medical care it must be proved that the actions complained of were such as to amount to intentional denial or withholding of essential medical treatment. The judge stated, in addition, that in order to show denial or withholding of medical treatment, constituting a violation of constitutional rights, the evidence must prove acts or omissions by the defendants, or any of them, sufficiently harmful to evidence the existence of deliberate indifference to the serious medical needs of plaintiff's decedent.

From scrutiny of the evidence it appears that Dr. Garcia did not fail to give adequate attention to or withhold treatment from Jesse Daniels. He saw him almost immediately after he arrived and following admission to the hospital. Furthermore, he interviewed him at some length soon after arrival in order to gain information regarding his condition. Also the doctor was present when Jesse Daniels had become excited and had to be subdued. That is, when he had what might be described as a spell or seizure. Surely it cannot be said that there was a willful failure to give medical attention when this happened. These men, doctor and attendants, apparently did everything that they could reasonably do in order to subdue the defendant. The immediate problem was to prevent his running amuck; he had made one effort to stab someone with a pencil and to escape in the corridor. We must be mindful that Dr. Garcia and staff members were dealing with an emergency situation. There is no indication that

they shirked their duty or turned away from providing medical care.

The plaintiff's theory of the case was that Dr. Garcia was neglectful in not ascertaining information from Hervie Daniels, the father, regarding the background of the patient. This may well be but from a consideration of all of the details of the arrival and hospitalization of Jesse, it cannot be said that the conduct of Dr. Garcia constituted any lack of interest constituting a violation of Jesse's constitutional rights. It is argued that Jesse had a constitutional right to have the doctor listen to his father regarding the kind of injection that he could use. It is not, however, contended that Dr. Garcia did this deliberately; it is contended that his attention was diverted elsewhere and he was not present to hear what the father had to say about it. This may have been negligent but whether or not it would have prevented the ultimate death of Jesse is another matter. One can only speculate about that because there is no evidence establishing its truth. Not a single doctor called to the witness stand was able to give an opinion as to the cause of death—not one—and a number of them testified and were cross-examined at length by counsel for Jesse.

We are unable to conclude that a physician must accept a lay recommendation of a drug which should be used. If he does so and it produces a bad result, he could very well be subject to condemnation. The physician must make this decision. In any event the father's recommendation was not communicated to him.

■ What are the dimensions of a malpractice tort? They encompass the violation of a duty which the physician, by virtue of his relationship to the patient, owes to exercise reasonable care in treating the patient. Thus, if the physician subjects the patient to an unreasonable risk of harm and harm is suffered, he can be held liable. The evidence would have to show that had the doctor acted with care the resulting injury or illness would not have occurred. Whether the facts here presented would have justified submission as a malpractice case was not alleged and we are not at liberty to decide such a question.

■ The question is whether the proven facts are sufficient to establish a *prima facie* case of violation of Jesse's constitutional right. This is a more severe and exacting charge than malpractice. One reason that it is more serious and more severe is the fact that it has an intentional quality about it. Thus there must have been a willful failure, for example, to give medical attention or where such attention was plainly necessary. In some circumstances a reckless quality attending the conduct would suffice.

We hold in this case that from an examination of all the facts cited above, a violation of constitutional dimension has not occurred. It is quite true that the jury found that it had, but this does not free us from our obligation to review the facts in the light of the applicable law nor does it obviate the need to decide whether the court erred in submitting the case to the jury.

We must conclude that the court did commit error. The case, as shown by the evidence, did not reach the magnitude necessary to be a violation of a constitutional principle.

There is another, and a related reason, for our having to reverse the judgment against Garcia in this case and that is that one of the elements that is common to both the medical malpractice case and the § 1983 case is the necessity for proof that the act or conduct of the defendant was the proximate or legal cause of the injury to the victim. This means that there must be proof that the conduct of Dr. Garcia caused the death. The defendant must have, by his conduct or failure to act, created a condition which was the substantial cause of death.

■ The causal element must, in a medical case like this, be proven by positive evidence. Here several physicians called by defendant testified and without exception they were unable to give an opinion on cause of death. Thus, this essential element is left to conjecture.

We have mentioned the elements of a malpractice case, but we have done this for the purpose of comparing it to the kind of case which is before us, and on which we have ruled; that is, the action which is alleged to be a violation of 42 U.S.C. § 1983. Our conclusion is that the evidence fails to support the verdict for plaintiffs pursuant to that section. We have refrained from expressing àny opinion on medical malpractice. This was not before us.

Judgment of the district court is reversed with directions to dismiss the present case.

BREITENSTEIN, Circuit Judge, concurring in the result.

I concur in the result. The proof does not establish that the defendants-appellants, or any of them, deprived either the decedent or the plaintiffs-appellees of any rights, privileges, or immunities secured by the Constitution of the United States. Accordingly, no claim may be asserted under 42 U.S.C. § 1983. In each case the judgment should be reversed and the case should be remanded with directions to dismiss.