ARTHUR HOPPER, administrator, & another,[1] *vs.* JAMES J.
CALLAHAN, JR., & others.[2]

Suffolk. September 4, 1990. - November 20, 1990.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, & GREANEY, JJ.

*Practice, Civil,* Interlocutory appeal, Summary judgment. *Civil Rights,*
Mental health, Immunity of public official. *Due Process of Law,*
Mental health. *Mental Health. Negligence,* Medical malpractice. *Mas-
sachusetts Tort Claims Act. Medical Malpractice,* Public employee.
*Doctor,* Employment.

Statement of governing principles of law concerning the liability of a medi-
cal professional under 42 U.S.C. § 1983 (1982) to an involuntarily
committed psychiatric patient with regard to the patient's essential
medical care and right not to be unduly restrained. [624-627]
At the trial of Federal civil rights claims under 42 U.S.C. § 1983 (1982)
arising from the death of a psychiatric patient involuntarily committed
to and held in seclusion at a mental health facility operated by the
Department of Mental Health, the judge correctly denied motions of
two physicians for summary judgment where, with regard to certain
seclusion orders, there was enough evidence in the record to show that
required medical attention to the patient's condition may have been de-
nied to her in circumstances that a jury could reasonably conclude
demonstrated grossly negligent conduct amounting to a failure to exer-
cise professional judgment. [630-631]
At the trial of Federal civil rights claims under 42 U.S.C. § 1983 (1982)
arising from the death of a psychiatric patient involuntarily committed

---

[1]Lenore McAuley, administratrix. The plaintiffs are coadministrators of
the estate of their daughter, Nancy E. Hopper.

[2]The defendant Callahan was sued individually and as Commissioner of
the Department of Mental Health. William Gibson was sued individually
and as superintendent and area director of the Solomon Carter Fuller
Mental Health Center. The action has been dismissed as to Callahan and
Gibson in their official capacities, and we are here concerned only with the
claims against them individually. Dr. George Papanek is a defendant
individually and as clinical director of the Solomon Carter Fuller Mental
Health Center. The other defendants involved here are Dr. Saeid Elmi and
Dr. Joseph Parks.

to and held in seclusion at a mental health facility operated by the Department of Mental Health, the judge correctly denied a motion for summary judgment by a physician where, with regard to his role as a ward psychiatrist in reviewing the appropriateness of a seclusion order, the record did not conclusively demonstrate that he was no more than ordinarily negligent (if that) in fulfilling his role as ward psychiatrist and hence not liable under § 1983. [631]

At the trial of Federal civil rights claims under 42 U.S.C. § 1983 (1982) arising from the death of a psychiatric patient involuntarily committed to and held in seclusion at a mental health facility operated by the Department of Mental Health, the judge correctly denied motions for summary judgment by supervisory administrators where, on the record, they did not show beyond dispute that any failures at the mental health facility in the level of staffing, in the supervision and training of personnel, or in the control of the size of the facility's inmate population that may have caused the patient's death were due to a lack of funding; moreover, they failed to demonstrate, without dispute of material fact, that they did not depart substantially from accepted professional standards. [631-634]

At the trial of State law claims for wrongful death, medical malpractice, and negligence arising from the death of a psychiatric patient involuntarily committed to and held in seclusion at a mental health facility operated by the Department of Mental Health, a judge properly denied a physician's motion for summary judgment based on his claim that he was immune from liability as a public employee under G. L. c. 258, § 2, where the record was inadequate to resolve conclusively the issue whether the physician was subject to the direction and control of the Commonwealth. [634]

At the trial of State law claims for wrongful death, medical malpractice, and negligence arising from the death of a psychiatric patient involuntarily committed to and held in seclusion at a mental health facility operated by the Department of Public Health, a judge properly denied summary judgment based on a physician's claim that he was entitled to immunity under G. L. c. 112, § 12B, known as the Good Samaritan statute, and also under G. L. c. 123, § 22, concerning physicians' restraint orders, where the record did not show that no dispute of material fact existed regarding the physician's status as a "Good Samaritan," and where there was a dispute of material fact as to whether there was a lawful basis for the patient's seclusion and whether the requirements of G. L. c. 123 were followed in secluding the patient. [634-635]

CIVIL ACTION commenced in the Superior Court Department on September 10, 1985.

Motions for summary judgment were heard by *John C. Cratsley*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*Paul A. Good*, Special Assistant Attorney General, for William Gibson.

*Vincent L. DiCianni*, Special Assistant Attorney General, for George O. Papanek.

*James H. Anderson* for Joseph Parks.

*Joan Eldridge* for Saeid Elmi.

*Richard W. Cole* for the plaintiffs.

*Francis G. Chase*, Special Assistant Attorney General, for James J. Callahan, Jr., was present but did not argue.

WILKINS, J. On December 1, 1984, while held in seclusion at the Solomon Carter Fuller Mental Health Center (Fuller), Nancy E. Hopper (Hopper) died of a ruptured fallopian tube due to an ectopic pregnancy. On the previous day, Hopper had been involuntarily admitted to Fuller, a mental health facility operated by the Department of Mental Health.

The plaintiffs, claiming the denial of substantive due process rights, assert violations of 42 U. S. C. § 1983 (1982), and also assert State law claims for wrongful death, medical malpractice, and negligence. Each defendant moved for summary judgment on the Federal civil rights claims. A judge of the Superior Court allowed the motion, without objection, as to the claims against Callahan and Gibson in their official capacities. He rejected, however, the assertion of each defendant that he was entitled to qualified immunity from the remaining § 1983 claims, concluding that Hopper had constitutional rights that were clearly established at the time of the alleged violations and that these rights may have been violated. Then, applying the standard for determining personal liability under § 1983 stated in *Youngberg* v. *Romeo*, 457 U.S. 307 (1982), the judge concluded as to each defendant that there was a genuine dispute of material fact as to whether that standard was violated and that, therefore, sum-

mary judgment was not warranted on the § 1983 claims. The defendants have exercised their right to seek interlocutory appellate relief from the denial of their summary judgment motions. See *Breault* v. *Chairman of the Bd. of Fire Comm'rs of Springfield*, 401 Mass. 26, 31 (1987), cert. denied sub nom. *Forastiere* v. *Breault*, 485 U.S. 906 (1988).

The defendants Callahan, Gibson, and Papanek also moved for summary judgment on the ground that, under G. L. c. 258, § 2 (1988 ed.), as public employees, they are immune from liability on the State law claims. The judge allowed the motions as to Callahan and Gibson because there was no dispute of material fact on the question of their status as public employees. The judge denied Papanek's motion because the record did not show indisputably that he was a public employee when, as a physician, he treated Hopper. A single justice of the Appeals Court granted Papanek leave to take an interlocutory appeal on his claim of immunity as a public employee and directed that his appeal be consolidated with the appeal of the civil rights issue.

The single justice of the Appeals Court also allowed, on the same terms, interlocutory review of the denial of summary judgment on the claim of Parks that he was entitled to immunity under G. L. c. 112, § 12B (1988 ed.), known as the Good Samaritan statute, and also under G. L. c. 123, § 22 (1986 ed.), concerning physicians' restraint orders. The motion judge had denied Parks's summary judgment motion based on these statutes without discussion.

This court granted the defendants' application for direct appellate review. We affirm the motion judge's orders denying the defendants' motions for summary judgment. We shall first set forth the governing principles of law on the § 1983 claims, then present the facts generally and as to each defendant, and thereby demonstrate that there are disputes of material fact barring summary judgment. We shall then discuss the separate claims of immunity of Papanek and Parks.

1. *Section 1983 claims.* At the time of the alleged civil rights violations, the plaintiff, as an involuntarily committed psychiatric patient, had a clearly established Federal due

process right (a) to essential medical care and (b) not to be physically restrained unduly. For that reason, no defendant was entitled to qualified immunity from liability for the consequences of any violation of Hopper's Federal civil rights that he may have caused. See *Anderson* v. *Creighton,* 483 U.S. 635, 638-639 (1987); *Harlow* v. *Fitzgerald,* 457 U.S. 800, 819 (1982); *Germany* v. *Vance,* 868 F.2d 9, 16 (1st Cir. 1989). The contours of Hopper's rights were sufficiently clear on November 30, 1984, that a reasonable official would have understood what those rights were. See *Anderson* v. *Creighton, supra* at 640. Thus, there is no valid basis for the defendants' various arguments that they could not have known that what they are alleged to have done, or failed to have done, was a violation of clearly established civil rights.

In *Youngberg* v. *Romeo, supra* at 314-315, the Supreme Court considered for the first time the substantive rights under the Fourteenth Amendment to the Constitution of the United States of involuntarily committed mentally retarded persons. The State conceded, and the Supreme Court acknowledged (*id.* at 324), that such a person is entitled to adequate medical care. *Id.* at 315. The constitutional right of a person in Hopper's position to adequate medical care was generally acknowledged well before her death. See *Society for Good Will to Retarded Children* v. *Cuomo,* 737 F.2d 1239, 1243 (2d Cir. 1984) ("It cannot be disputed"); *Lombard* v. *Eunice Kennedy Shriver Center for Mental Retardation, Inc.,* 556 F. Supp. 677, 679 (D. Mass. 1983) ("the Fourteenth Amendment imposes an affirmative obligation on the state to provide adequate medical care for involuntarily committed residents of state mental institutions"). It makes no difference that Hopper was a short-term care patient in an acute psychotic state and that the plaintiff in the *Youngberg* case was a mentally retarded person who had been committed for an extensive period. See *DeShaney* v. *Winnebago County Dep't of Social Servs.,* 489 U.S. 189, 199-200 (1989).

A person's right under the due process clause to freedom from undue bodily restraint existed before the *Youngberg*

case was decided. See *Youngberg* v. *Romeo, supra* at 316. In that case, the right of an involuntarily committed mental patient to freedom from undue restraint was explicitly recognized. *Id.* See *Garrett* v. *Rader,* 831 F.2d 202, 203-204 (10th Cir. 1987). We, therefore, have no doubt that Hopper had a clearly recognized § 1983 right not to be subjected to undue restraint.[3] Although the Supreme Court has not defined all the circumstances that would justify the imposition of restraints despite a mental patient's general due process right to be free from undue restraint, in this case the seclusion of Hopper can be justified only if there was an emergency or medical necessity requiring that seclusion.

Our attention now turns to the question of the standard to which the defendants are held in a § 1983 action seeking to recover damages for the alleged denial of rights clearly established under the Constitution of the United States. The *Youngberg* opinion set forth the standard for persons of the defendants' professional status, stating that "liability may be imposed only when the decision by the professional is such a

---

[3]The plaintiffs rely on claimed violations of G. L. c. 123, § 21, concerning the use of restraints on a mentally ill patient, in support of their assertion that the seclusion of Hopper was a violation of her Fourteenth Amendment rights. In *Rogers* v. *Okin,* 478 F. Supp. 1342, 1375 (D. Mass. 1979), aff'd in part and rev'd in part and remanded, 634 F.2d 650 (1st Cir. 1980), vacated and remanded, sub nom. *Mills* v. *Rogers,* 457 U.S. 291 (1982), the District Court judge held that failure to follow certain prescribed procedures of § 21 was a violation of the plaintiffs' due process liberty interest under the Fourteenth Amendment. The violations included the indiscriminate use of seclusion, the failure to make out forms, and the failure to review incidents of seclusion seasonably. 478 F. Supp. at 1375. The Court of Appeals did not adopt the District Court judge's reasoning, noting that not every violation of a State law constitutes a denial of a constitutionally protected liberty or property interest. 634 F.2d at 663. In *O'Sullivan* v. *Secretary of Human Services,* 402 Mass. 190, 197 n.10 (1988), this court said in dictum that "[s]eclusion practices" in violation of § 21 would be a violation of a protected liberty interest under the Fourteenth Amendment. That case did not involve the propriety of seclusion in particular circumstances, but rather a requirement of periodic observation of patients in seclusion. *Id.* at 191-192. We have not decided that the seclusion of a person in the absence of an emergency, and thus in violation of § 21, is either automatically a violation of § 1983 rights or a ground for personal liability under § 1983.

substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg* v. *Romeo, supra* at 323. We shall come back to what the *Youngberg* opinion says about the effect of budgetary constraints on a person's ability to satisfy accepted standards.

The *Youngberg* statement of the basis for a professional's liability has been accepted as saying that more than ordinary negligence must be shown, but it leaves some uncertainties. Liability could be based on gross negligence or conscious indifference that involved no application of professional judgment at all. See *Estate of Conners* v. *O'Connor*, 846 F.2d 1205, 1208 (9th Cir. 1988), cert. denied, 489 U.S. 1065 (1989). It appears, moreover, that the Court's formulation in its *Youngberg* opinion holds a defendant to a higher standard than the "deliberate indifference to serious medical needs" standard applicable in the case of incarcerated criminals and stated in *Estelle* v. *Gamble*, 429 U.S. 97, 105-106 (1976) (defining Eighth Amendment rights of prisoners). *Youngberg* v. *Romeo, supra* at 321-322. "Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish. Cf. *Estelle* v. *Gamble*, 429 U.S. 97, 104 (1976)." *Youngberg* v. *Romeo, supra.* We shall apply the *Youngberg* standard, as did the motion judge.[4]

---

[4]The opinion of this court in *McNamara* v. *Honeyman*, 406 Mass. 43 (1989), joined in by only four Justices, could be read to suggest that the deliberate indifference standard should be applied to § 1983 claims on behalf of a person involuntarily committed to a State hospital. The circumstances involved in the *McNamara* case arose prior to the release of the *Youngberg* opinion, which may explain why the court did not apply the *Youngberg* standard (although the opinion does not say so explicitly and the plaintiff did rely on the *Youngberg* case; *id.* at 52). In any event, the statement in that opinion (*id.* at 53) that gross negligence cannot generally be the basis for § 1983 liability relies on cases involving prisoners' rights under the Eighth Amendment to the Constitution of the United States and not on cases involving the § 1983 rights of persons who have committed no crime but are restrained by the State. In considering the § 1983 rights of

With the applicable principles concerning § 1983 liability described, we can now consider facts presented on the summary judgment record. We start with a general description of how Hopper became a patient at Fuller on November 30, 1984, and what then happened. We must, of course, credit the record facts that are most favorable to the plaintiffs in passing on the defendants' motions for summary judgment.

Hopper, who was twenty-seven years old, came to the Boston City Hospital shortly before midnight on November 29, 1984. She was well-known there and at Fuller. The emergency room form states that Hopper was more psychotic than usual, more sexually involved than usual, vomiting, and complaining of abdominal pain. A doctor diagnosed her condition as gastroenteritis and referred her to the city hospital emergency psychiatric service for screening. There the defendant Parks, a first-year resident in the Boston University psychiatry residency training program, saw Hopper, whom he had treated previously. Parks concluded that her schizophrenia was exacerbated and that Hopper could not care for herself. He ordered that she be hospitalized. She was taken by ambulance to Fuller.

A doctor admitted Hopper to the fifth floor ward of Fuller at 3 A.M. on a ten-day involuntary basis pursuant to G. L. c. 123, § 12(b) (1988 ed.). He ordered various tests, including a pregnancy test. About an hour later, Hopper fell in a bathroom and was cut over her left eye. Hopper again complained of abdominal pain and, by placement of her hands, appeared to indicate sensitivity in her genital area. Members of the staff had to carry her back to bed; she felt like dead weight. For the rest of the night Hopper refused to wear any clothes. The ward had more than twenty patients, almost equally divided between men and women. During the morning of November 30, Hopper refused to wear any clothes and insisted on lying on the day room floor. An attempt to alter

---

mentally ill or mentally retarded persons, involuntarily restrained, we shall not apply the standard of the prisoners' rights cases, at least as to events occurring after the *Youngberg* opinion was released.

this conduct by placing her in an unlocked room failed. At 8:30 A.M., on request of the staff, the defendant Parks, who worked at Fuller as well as at the Boston City Hospital, approved a seclusion order which he signed at 9:30 A.M. The record would support the conclusion that Parks did not then see Hopper although the policy of the Department of Mental Health required that, whenever possible, the ordering physician see the patient within a reasonable time. Parks had no further contact with Hopper.

Hopper, who stayed in seclusion during the day, continued to refuse to wear clothes. In the early afternoon, the defendant Papanek, in his role as ward psychiatrist and as part of his responsibility, reviewed the appropriateness of the determination that Hopper should be in seclusion. He did not examine Hopper. Late in the afternoon the defendant Elmi, the doctor on call at Fuller at that time, spoke with Hopper, did not otherwise examine her, renewed the seclusion order, and directed that her vital signs be checked every fifteen minutes. Elmi did not thereafter see Hopper, except he took her pulse between 5 P.M. and 6 P.M. No vital signs were taken after 8 P.M. Except for Elmi's early evening observation, no physician examined Hopper while she was in seclusion for many hours before her death.

The seclusion order expired by its terms at 12:45 A.M. on December 1. It was not reviewed until after 7 A.M. when Elmi signed it, indicating incorrectly that it had been entered at 12:45 A.M. The 12:45 A.M. seclusion order form shows no safety checks after 6:15 A.M. At 7:05 A.M., a nurse saw that Hopper was in a strange position, slumped half on and half off the mattress. Hopper was unresponsive to voice or touch and was pronounced dead on arrival at Boston City Hospital.

During 1984, Fuller often had significantly more patients than it was designed to accommodate and, at the same time, it had problems with understaffing. Among the people identifying the problem were the defendant Papanek, Fuller's clinical director, and the defendant Gibson, Fuller's superintendent. The defendant Callahan was also aware of problems at Fuller. In August, 1984, before Hopper's death, another

patient had died of medical problems in the same seclusion room in which Hopper had died. An investigation of the earlier death found deficiencies in medical and nursing supervision and training at Fuller.

We first focus on the summary judgment issue with respect to Parks and Elmi and conclude that neither has shown that there is no dispute of material fact as to him on the issues of the propriety of the seclusion orders and the failure to provide necessary medical care. We acknowledge, as do the plaintiffs, that negligence alone will not support a § 1983 claim. We must determine, as to each defendant, whether the record shows indisputably that no decision of his was such a substantial departure from accepted professional judgment, practice, or standards that that defendant did not base that decision on accepted professional judgment. *Youngberg* v. *Romeo, supra* at 323.[5]

On the summary judgment record, one could fairly conclude the following. Neither Parks nor Elmi is shown conclusively to have signed seclusion orders in an emergency or medical circumstance justifying seclusion. In each instance, they responded to requests of the staff for seclusion orders. Parks signed an order without any physical examination of Hopper. Elmi signed the first of his two seclusion orders largely based only on what the staff told him. He conducted no physical examination. That seclusion order expired at 12:45 A.M. on December 1 and was not renewed. At 6 A.M. Elmi was told that the patient had been in seclusion for over five hours without authorization. He did not respond until after 7 A.M.

In the instances of the entry of the seclusion orders, there is enough evidence in the record to show that required medical attention to Hopper's condition may have been denied to her in circumstances that a jury could reasonably conclude

---

[5]The *Youngberg* standard is not satisfactorily expressed, and the Supreme Court has not since clarified it. As stated, it could be read to include ordinary negligence, that is, a medical decision that was not based on accepted medical practice. However, as we have said, more than ordinary negligence must be involved.

demonstrated grossly negligent conduct amounting to a failure to exercise professional judgment. The two doctors could be found to have applied no medical judgment at all in entering the seclusion orders and to have abdicated any responsibility for investigating Hopper's medical condition, leaving the judgment concerning seclusion and medical care in each instance to inadequately trained, overworked staff.

The summary judgment issue as to Papanek must be considered with respect to both his position as ward psychiatrist for the fifth floor of Fuller and his position as Fuller's clinical director. We discuss Papanek's role as ward psychiatrist first. The record does not show the professional duties of a ward psychiatrist to the degree necessary to permit us to conclude that Papanek unquestionably did not depart substantially from accepted medical practice. Papanek agrees that part of his job was to review the appropriateness of seclusion. In reviewing Hopper's record in the early afternoon of November 30, Papanek could have seen that the hospital record did not describe an emergency requiring seclusion or show that Parks had observed Hopper before the seclusion order was entered, as he should have. It did show that Hopper had had medical problems and that those problems may not have been adequately addressed. Moreover, monitoring of Hopper's condition while in seclusion was the responsibility of a staff that Papanek had characterized as overworked and inadequately trained. Papanek did not see Hopper at any time on November 30 or December 1. It may well be that Papanek was no more than ordinarily negligent (if that) in fulfilling his role as ward psychiatrist and hence not liable under § 1983. The record, however, does not conclusively demonstrate that fact.

We consider the plaintiffs' claims against Papanek in his supervisory role as clinical director together with the claims made against Gibson and Callahan based on their alleged failures as supervisors. It is clear that each recognized problems at Fuller before Hopper's death. Papanek urged

Gibson to take corrective steps.[6] Gibson, aware of the problems, in turn had pressed Callahan. In reference to the problems at Fuller, Callahan held meetings and tried to have corrective measures taken to improve the quality of the staff at Fuller.

In determining the § 1983 liability of a supervisory administrator for the failure to provide necessary care and personnel and adequate supervision, the same standard of *Youngberg* v. *Romeo* applies as we have applied to the defendant medical professionals. *Youngberg* v. *Romeo, supra* at 309. *Estate of Conners* v. *O'Connor,* 846 F.2d 1205, 1207 (9th Cir. 1988), cert. denied, 489 U.S. 1065 (1989). Here, however, the possibility that professional standards may not have been met because of the lack of appropriated funds must be recognized. Thus, although the absence of funding cannot be a factor in determining the scope of a constitutional right, it is a factor in determining whether one may recover against an individual for the denial of a constitutional right to appropriate handling and treatment. *Youngberg* v. *Romeo, supra* at 323. *Thomas S. by Brooks* v. *Morrow,* 601 F. Supp. 1055, 1059-1060 (W.D. N.C. 1984), aff'd in part and modified in part and remanded, 781 F.2d 367 (4th Cir.), cert. denied sub nom. *Kirk* v. *Thomas S. by Brooks,* 476 U.S. 112 (1986). "In an action for damages against a professional in his individual capacity, however, the professional will not be liable if he was unable to satisfy his normal professional standards because of budgetary constraints; in such a situation, good-faith immunity would bar liability." *Youngberg* v. *Romeo, supra.*

We accept the fact that inadequate funding in 1984 had an effect on the Department of Mental Health generally and on its capacity to provide care and supervision in all its operations. On the summary judgment record, however, the supervisory defendants have not shown beyond dispute that any

---

[6]Five days before Hopper died, Papanek wrote Gibson saying that, with an "intolerable shortage of staff" and an inpatient census of eighty-six, Fuller had "reached the point of extreme danger for patients and staff." He urged Gibson to "close admissions immediately before tragedy strikes."

failures at Fuller in the level of staffing, in the supervision and training of personnel, or in the control of the size of Fuller's inmate population that may have caused Hopper's death were due to a lack of funding.

Moreover, on this record, the defendants have not established by undisputed evidence that they did not so substantially depart from accepted standards of performance to which they should have adhered that it is clear that they cannot be liable under the *Youngberg* standards. Better training and supervision of staff and clear and limiting guidelines for the seclusion of patients, for example, might have been implemented after the death of a Fuller patient in August, 1984, and before Hopper's death. Any failure to do these things and to take other remedial steps could be the basis of § 1983 liability, depending on what the *Youngberg* standard calls for from people in these supervisory positions, a fact not clearly established in the supervisory defendants' favor on this record.

In our analysis of the summary judgment record that has led to the conclusions we have expressed, we have not relied on the affidavits of Dr. Robert Sovner, a psychiatrist, presented by the plaintiffs as to each defendant. Each defendant objects to the failure of the motion judge to strike the Sovner affidavit applicable to him. Sovner's opinions that each of the defendants substantially departed from accepted professional or medical practice are not important to the resolution of the summary judgment issues that we have decided. To succeed on his summary judgment motion, each defendant had the burden to demonstrate, without dispute of material fact, that he did not depart substantially from accepted professional standards. The plaintiffs had no burden to show the contrary. No defendant has presented an expert opinion stating, or uncontroverted facts showing, that he did not violate the *Youngberg* standard. In that circumstance, no rebuttal affidavit from an expert for the plaintiffs was necessary.[7]

---

[7] On this record, without a supporting expert opinion, no lay person could

2. *G. L. c. 258, § 2.* The judge properly denied Papanek's
motion for summary judgment based on the claim that he is
immune from liability because, under G. L. c. 258, § 2, he is
a public employee. It is apparent from the judge's memoran-
dum of decision that he would have allowed the motion if
Papanek had had responsibility only for supervising patient
care as clinical director. Because, however, Papanek, as a
ward psychiatrist, had also treated Hopper, the judge con-
cluded that the record failed to show no dispute of material
fact as to whether Papanek was a public employee.

The issue here is whether Papanek was subject to the di-
rection and control of the Commonwealth. *Kelley* v. *Rossi,*
395 Mass. 659, 661-662 (1985). *Smith* v. *Steinberg,* 395
Mass. 666, 669 (1985). G. L. c. 258, § 1 (1988 ed.). The
record simply is not adequate to resolve the issue conclu-
sively. The rights of the clinical director and other superiors
to control the activities of a ward psychiatrist would be in-
structive on the question. In this respect, the right to control
hours and working schedules and the right to supervise
Papanek's activities and who his patients would be are also
relevant considerations.

3. *G. L. c. 112, § 128, and G. L. c. 123, § 22.* Parks was
not entitled to summary judgment on his claim that under
G. L. c. 112, § 12B, and G. L. c. 123, § 22, he is immune
from liability. Section 12B of G. L. c. 112 provides protec-
tion against liability to a physician who renders emergency
care or treatment in certain circumstances. The physician
must have acted "as a volunteer and without fee" and "other
than in the ordinary course of his practice."

The summary judgment record would permit the conclu-
sion that Parks came to the fifth floor ward of Fuller to treat
Hopper because no other physician was available; he had au-
thority to order her seclusion; he was responsible for her care
on November 30, 1984, from 9 A.M. to 5 P.M.; and he had a

---

properly conclude that it is unquestionably clear that the defendants, or
any one of them, adhered to the *Youngberg* standard.

salaried position when working his required hours at Fuller. The record does not show no dispute of material fact concerning Parks's status as a Good Samaritan. Indeed, it seems that Parks, while compensated for his services, acted in the ordinary course of his practice in secluding Hopper.

Section 22 of G. L. c. 123 provides immunity to a physician for restraining a person if the physician acts pursuant to the provisions of G. L. c. 123. There is a dispute of material fact, as we have shown, whether there was a lawful basis for Hopper's seclusion and whether the requirements of G. L. c. 123 were followed in secluding her. If § 22 were to provide immunity to Parks, it would extend only to his conduct concerning Hopper's seclusion and, even there, perhaps not to the § 1983 claim based on Hopper's allegedly unlawful seclusion.[8]

4. The orders entered in the Superior Court denying the defendants' various motions for summary judgment are affirmed.

*So ordered.*

---

[8]Although we need not reach the issue, there is substantial doubt that either of the two State statutes we have discussed would be effective to grant immunity against a § 1983 claim based on the deprivation of due process rights protected by the Fourteenth Amendment. See *Martinez* v. *California*, 444 U.S. 277, 284 & n. 8 (1980).