Kaplan, Mitchell H., J.
This action arises out of the death of the plaintiffs decedent, Leshawn Nelson’s (collectively, “Nelson”), while he was an inmate at the Worcester County House of Corrections (the “House of Corrections”). Nelson asserts claims (i) against defendants Dr. Thomas Patnaude and Worcester Internal Medicine Associates (“WIM”) for negligence, gross negligence and medical malpractice (Count I) and breach of express and implied warranties (Count II); and (ii) against Dr. Patnaude under 42 U.S.C. §1983 (Count IV).[1] The case is before the court on Dr. Patnaude’s and WIM’s motions for summary judgment. For the reasons that follow, Dr. Patnaude’s motion is DENIED, in part, and ALLOWED, in part, and WIM’s motion is ALLOWED.
BACKGROUND
The following relevant facts are undisputed or viewed in the light most favorable to the plaintiff.
At all times relevant to this action, Dr. Patnaude was employed by the Worcester County Sheriffs Office (“WCSO”) as Medical Director of the House of Corrections. He retired in 2009. For a period beginning well before the events at issue in this case, he worked part time for WCSO and also was a member of WIM where he had a private practice. With respect to his employment with WCSO, Dr. Patnaude was entered in the Commonwealth Automated Payroll System as a WCSO employee and received a W-2 form for each year of his employment. He was enrolled in the Commonwealth’s life insurance program, which is available only to employees of the Commonwealth, and with the State Retirement Board retirement system, an enrollment also only available to employees of the Commonwealth. Since his retirement, he has received retirement benefits through the retirement system.
The description of Dr. Patnaude’s position with the WCSO stated that Dr. Patnaude was the primary care doctor for the jail inmates. He was required to examine, evaluate and treat inmates at the House of Corrections, including making routine sick calls. He carried a beeper and was available to be called for medical emergencies at any time, although at least during some periods not relevant to this case he arranged for other physicians to cover for him. He was also responsible for supervising the “provision of all levels of health care and the quality and accessibility of all health services provided to inmates." This included supervising other health care professionals such as nurse practitioners, RNs and LPNs, among others. Dr. Patnaude reported to the assistant superintendent of the House of Corrections. Dr. Patnaude did not have any medical personnel senior to him and made decisions concerning the medical treatment of *265 all inmates and whether to order outside medical services for, or hospitalization of, an inmate.
Nelson was admitted as an inmate at the House of Corrections on or about June 13, 2005. On that date, medical personnel screened him and recorded his blood pressure as 180/110. Nelson’s height was noted as 5’ 7" and his weight as 240 pounds. His blood pressure was taken again the following day and reported to be 160/98; a note was entered “refer to MD.” Dr. Patnaude saw Nelson on June 17th. Nelson’s blood pressure was still elevated. Dr. Patnaude asked Nelson if he had a family history of high blood pressure; Nelson responded that he did not, although this was inaccurate. Dr. Patnaude recommended medication to address the elevated blood pressure, but Nelson refused it. Nelson agreed to try and lose weight and reduce the salt in his diet. Nelson’s blood pressure was taken again on June 20th and continued to be elevated.
Nelson was playing basketball on the evening of June 26, 2005, a warm evening. When he returned to his cell, he was sweating profusely, breathing heavily and complaining of shortness of breath and chest pain. Other inmates brought this to the attention of correctional officers, who brought Nelson to the infirmary at 7:55 PM. The record does not indicate how much time passed between the onset of theses symptoms and his arrival at the infirmary. There, he was evaluated by a licensed practical nurse on staff, Phillips Wood.
Nelson complained of chest pain and continued to sweat. Wood evaluated Nelson and recorded his blood pressure as 200/140. He incorrectly believed that Nelson was likely suffering from heat exhaustion, as it was a warm night. At 8:10, Wood called Dr. Patnaude. Dr. Patnaude ordered a dose of Lasix “stat” and the medication Norvasc, 5 mg daily. He also ordered that “Nelson be placed on serial blood pressures for the next five days.” Dr. Patnaude directed Wood to repeat the blood pressure in ten minutes to evaluate the need for hospitalization.
Nelson collapsed and became unresponsive at approximately 8:20. Paramedics were called at 8:25 and arrived at the jail approximately 15 minutes later, although they did not reach Nelson until 8:47. Nelson arrived at the hospital at 9:23 and was pronounced dead at 9:30. The medical examiner reported that Nelson had an acute occlusion of the proximal left anterior descending artery.
DISCUSSION
I. Standard of Review
Summary judgment is granted when there is no genuine issue of material fact and the summary judgment record entitles the moving party to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Corr., 390 Mass. 419, 422 (1983). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and that the summary judgment record entitles him to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). The moving 0:LNOQYahis burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element. Flesner v. Technical Commc’ns Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors, 410 Mass. 706, 716 (1991). Once the moving party establishes the absence of a triable issue, the burden shifts to the nonmoving party to respond by “set[ting] forth specific facts showing that there is a genuine issue for trial.” Mass.R.Civ.P. 56(e); Kourouvacilis, 410 Mass. at 716.
II. The Claims Against Dr. Patnaude
A. The State Law Claims
Counts I and II allege, in effect, state law tort claims for providing negligent medical care to Nelson.[2] Dr. Patnaude argues that he was a public employee of the WCSO, acting within the scope of his employment, when he treated Nelson. In consequence, under G.L.c. 258, §2, he cannot “be liable for any injury or . . . personal injury or death caused by his negligent or wrongful act or omission” while treating Nelson. Nelson disputes that Dr. Patnaude was a public employee when he provided medical care to him.
It is well established that §2 immunizes a public employee from liability for negligent conduct that occurs as a result of an act or omission undertaken within the scope of his public employment, whether the act is ordinarily or grossly negligent. See McNamara v. Honeyman, 406 Mass. 43, 46 (1989). Nelson does not dispute that legal principle or that the WCSO is a public employer; rather, he argues that Dr. Patnaude was not a public employee of the WCSO.
In Kelley v. Rossi, 395 Mass. 659 (1985), the Supreme Judicial Court (SJC) considered whether the defendant doctor, who was a resident at the Boston City Hospital in a program operated by Boston University Medical School, was a public employee immune from suit premised on the negligent treatment of a patient. The case was on appeal from the trial court’s order granting summary judgment to the doctor. The SJC held that “(t]he legal principles that govern the determination whether the doctor was a ‘public employee’ of the cfiy and, therefore, freed from liability to the plaintiff by G.L.c. 258, §2, are the same as those that have determined whether an agent is a servant for whose negligent acts a principal may be liable under the common law doctrine of respondeat superior.” Id. at 661.
The SJC explained that while G.L.c. 258, §1 does not provide guidance as to when a person is a public employee, “the definition of ‘public employer’ does .. . [A] city... is a public employer if it ‘exercises direction and control over the public employee’. . . The right to control an agent’s activities has been the guiding *266 principle in deciding cases involving an assertion of vicarious liability against the agent’s principal.” Id. The SJC then went on to consider whether a doctor would always be an independent contractor: “It is true, however, that the very nature of a physician’s function tends to suggest that in most instances he will act as an independent contractor. Another person, unless a doctor himself, would have no right (or desire) to exercise control over the details of the physician’s treatment of a patient ...” Notwithstanding that generalized principle, the SJC noted, however, that “(a) house officer, such as a resident, has duties and obligations at a hospital that demonstrate that he or she is a servant. The general rule is that a resident is a servant of the hospital.” Id. at 663. The factual issue in dispute in the Kelley case turned on the question of whether the defendant doctor was a servant of the Ciiy (a public employer) or the hospital, which was operated by Boston Universiiy and therefore not a public employer. The holding of Kelley does not directly inform the question presented by the pending motion.
In McNamara, supra, the SJC again considered whether a doctor was a public employee immune from malpractice claims. In that case, the doctor was a psychiatrist employed by the University of Massachusetts Medical School. The court concluded that the doctor’s employer was a “public employer,” but stated that “does not automatically establish that all of its employees are public employees.” Rather, citing Kelley, the SJC explained that the test for whether someone was a public employee turns on the issue of whether “the principal controls the details of the physician’s activities.” 406 Mass, at 48.
McNamara involved an appeal following a jury trial in which the jury had found that the doctor was a public employee. The SJC held that there was sufficient evidence in the record, e.g., that the doctor had no say as to the ward he would work on, the hours that he worked, or the patients that he saw, to support the jury’s factual conclusion that the doctor’s employer controlled the “details of his activities.” Id. See also, Hopper v. Callahan, 408 Mass. 621, 634 (1990) (where the SJC held that whether a doctor employed by a state-owned hospital was immunized from a malpractice claim presented a jury question regarding direction and control).
Dias v. Brigham Medical Associates, Inc., 438 Mass. 317 (2002), did not address the question whether a certain doctor was a public employee, but rather whether he was the servant of a private employer that could be vicariously liable for his alleged malpractice. In Dias, the SJC held that “traditional respondeat superior liability applies to the employer of a physician, and that it is not necessary that the employer have the right or ability to control the specific treatment decisions of a physician-employee.” Id. at 318. Rather, to hold the employer liable for the defendant’s negligent acts the plaintiff “need only establish that (1) at the time of the alleged negligence [the doctor] was an employee of [the defendant employer] and (2) the alleged negligent treatment of the plaintiff occurred with the scope of the [doctor’s] employment.” Id. at 321-22.
In the Dias opinion, the SJC acknowledged that its opinion in Kelley might have misled the trial judge and the defendant into thinking that a direction and control analysis was necessary to decide whether the doctor’s employer was vicariously liable for the doctor’s alleged negligence, but they had misinterpreted that decision. Kelley was concerned with whether the doctor was a “public employee” and therefore immune from claims of malpractice, “not with the common-law analysis of respondeat superior that governs [a private employer’s] liability for the acts or omissions of its admitted ‘employee.’ ” Id. at 321.
Turning to the case now before the court, Dr. Patnaude returns to the frequently stated proposition that “[t]he test for determining whether an individual is a public employee is the same as that used to establish whether an agent is a servant for whose negligent acts a principal may be liable under the common law doctrine of respondeat superior.” McNamara, 406 Mass. at 48 (internal quotations omitted). He then points out that the recent Dias decision, which post-dates Kelley, McNamara, and Hopper, teaches that when both the employer and employee acknowledge an employer/employee relationship, the only question is whether the alleged negligent acts occurred within the scope of employment and no analysis of direction and control need be undertaken. In consequence, he argues that, since he and the WCSO both acknowledge an employer/employee relationship, which relationship is confirmed by W-2 forms and his participation in state insurance and retirement programs, the question of control and direction need not be addressed. Finally, as there is no dispute that his treatment of Nelson was provided within the scope of his job as medical director of the House of Corrections he is entitled to summary judgment as a matter of law.
The court acknowledges that there is much to recommend Dr. Patnaude’s argument. However, as discussed above, in Dias, the SJC spent some time explaining why its Kelley decision did not govern the respondeat superior analysis when the employer was not a “public employer,” because Kelley turned on the language of G.L.c. 258, §1, which defines a public employer as one who “exercises direction and control over the public employee.” This court therefore concludes that when the question before the court is whether a defendant, including a doctor, is a public employee, the resolution of the question still requires a determination of whether the public employer “exercises direction and control” over the defendant. Clearly, this court’s holding on the pending motion suggests that the broad statement that the test for *267 whether a defendant is a public employee is the same as the common law respondeat superior analysis is no longer, in all circumstances, accurate. Perhaps, in light of Dias, abetter statement of this principle would be that the test for whether a defendant is a public employee is the common-law direction and control analysis required when the question of whether the defendant is an employee or independent contractor is in dispute. In time, the appellate courts will likely decide whether that statement of law needs refinement or the exception suggested by this opinion can fit within the general rule — or whether this court erred in not accepting Dr. Patnaude’s argument.
Dr. Patnaude also argues, in the alternative, that even if the court concludes that it must determine whether the WCSO exercised direction and control over him, the court should find, as a matter of law, that it did. The court disagrees. Dr. Patnaude cites McNamara in support of his contention that he has established that he was subject to direction and control of the WCSO as a matter of law. However, in McNamara the SJC held that evidence in the record, such as that the defendant doctor was assigned award to work on, the hours that he was to work, and the patients that he was to treat, was adequate to support the jury’s factual conclusion that he was subject to the public employer’s control, not that control was established as a matter of law. The same is true here. There is certainly ample evidence in the summaiy judgment to support a jury finding that Dr. Patinaude was subject to the control of his employer, but it does not compel that outcome.[3]
B. The Federal Claim
Nelson also argues that Dr. Patnaude’s treatment of him violated the Eighth Amendment of the United States Constitution and 42 U.S.C. §1983. In order to recover on this claim, Nelson must prove that Dr. Patnaude’s failure to provide appropriate medical care “amounted to deliberate indifference to substantial risk of serious harm to [Nelson].” Ramos v. Patnaude, 640 F.3d 485, 489 (1st Cir. 2011) (Souter, J.). Ramos was also a case in which an inmate at the House of Corrections asserted a §1983 claim against Dr. Patnaude arising out of medical care that he received while incarcerated. In affirming the District Court’s order granting Dr. Patnaude’s motion for summaiy judgment, the First Circuit stated the following:
There is no question that Dr. Patnaude owed a duty to [the plaintiff] when acting on behalf of the House of Corrections under his contract to serve as its medical director. But the district court understood the record to show only arguable negligence with no reasonable possibility of a juiy finding that the doctor was deliberately indifferent, that is, that he actually understood that such a substantial risk existed and was actually indifferent to it in failing to take appropriate mitigating action. See Farmer v. Brennan, 511 U.S. 825, 837 (1994) (§1983 liability attaches only when the “official knows of and disregards an excessive risk to inmate health or safety”); Sires v. Berman, 834 F.2d 9, 13 (1st Cir. 1987) (in cases alleging deliberate indifference to medical risk, “(t]he care provided must have been so inadequate as to shock the conscience” (quoting Torraco v. Maloney, 923 F.2d 231, 231 (1st Cir. 1991)).
Similarly, in this case, in determining whether summaiy judgment should enter dismissing Nelson’s §1983 claim, this court must decide whether there is evidence in the summaiy judgment record that would permit a reasonable juiy to conclude not only that Dr. Patnaude was negligent, or even grossly negligent, but rather that he was deliberately indifferent to Nelson’s situation in a manner that shocked the conscience. In other words, there must be evidence that Dr. Patnaude was aware that not ordering treatment other than that which he actually did order created a substantial risk that Nelson would die or perhaps suffer significant avoidable injury, but Dr. Patnaude was indifferent to that risk. The court concludes that there is no evidence in the summary judgment record that could support such a juiy verdict.
Nelson has argued that more should have been done on June 17, 2005, when Dr. Patnaude first saw him, to convince him to begin medication and to change his life style. During oral argument, Nelson appeared to concede that even if Dr. Patnaude had succeeded in convincing Nelson to begin taking blood pressure medication that would not have prevented a heart attack suffered only nine days later. But even more fundamentally, Nelson has not argued that Dr. Patnaude’s treatment recommendations were wrong, much less indifferent to Nelson’s medical condition, but only that he did not press Nelson hard enough to follow them or explain the consequences of failing to. The medical staff at the House of Correction screened Nelson when he arrived, recognized the danger of his elevated blood pressure coupled with being overweight, and referred the case to Dr. Patnaude. Dr. Patnaude saw Nelson shortly thereafter, recommended medications, which Nelson rejected, and told him that he needed to change his diet and lose weight. Even if the evidence established that Dr. Patnaude could have been more forceful in his recommendations, he clearly did not show such indifference to Nelson’s condition that the Eighth Amendment had been violated.
Turning next to the events of June 26th, Dr. Patnaude received a call from Nurse Wood at 8:10 in the evening. There is no evidence that Dr. Patnaude could not immediately be reached or was slow to respond to an emergency call. He listened to Nurse Wood’s description of Nelson’s condition, including information concerning his elevated blood pressure. He ordered both immediate and long-term treatment. Dr. Patnaude told the nurse to administer a dose of *268 Lasix immediately and to recheck Nelson’s blood pressure in ten minutes to determine if hospitalization was needed; and then to begin another medication and monitor blood pressure closely over the next five days. Unfortunately Nelson went into cardiac arrest shortly thereafter. Even if Nelson could establish that competent diagnosis and treatment would have required that EMTs be called at once to transport Nelson to the hospital, there is simply no evidence that Dr. Patnaude’s response to the information provided by Nurse Wood, in the context of what Dr. Patnaude knew about Nelson from his examination a few days earlier, constituted indifference to Nelson’s condition, even if it arguably establishes that Dr. Patnaude, in the exercise of competent medical judgment, should have realized that Nelson might be suffering a cardiac episode and needed immediate intervention.
Finally, Nelson argues that Dr. Patnaude failed to educate the staff at the House of Corrections adequately concerning cardiac emergencies and, as a result: “Nelson was the victim of a hoax; a person [Nurse Wood] not licensed or remotely qualified to practice medicine was allowed, even assigned, to masquerade as a provider of medical care in an emergency . . . The only gesture toward treatment by Patnaude was a prescription for drugs — mooted minutes later when the patient coded. Leshawn Nelson received no medical care until he went into cardiac arrest.” The court does not pause long over this hyperbolic language. Although his impression of heat exhaustion was clearly in error, Nurse Wood did not try to manage Nelson’s medical condition on his own. He took vital signs, and called Dr. Patnaude who promptly responded to Wood. Dr. Patnaude knew Nelson’s medical history, as he had seen him nine days before. Dr. Patnaude ordered immediate medication and that vital signs be taken again in ten minutes. Dr. Patnaude may have erred in not ordering that the EMTs be called immediately, instead of waiting to see if Nelson improved, but that medical decision cannot support a finding of deliberate indifference to Nelson’s medical condition. A plaintiff cannot defeat a motion for summary judgment by vituperative narrative. As in Ramos, there are no facts in the summary judgment record to support the §1983 claim.[4]
III. Claims Against WIM
In Ramos, as in the present case, the plaintiff also brought a claim against WIM. As in Ramos, Dr. Patnaude treated Nelson in his capacity as the medical director of the House of Corrections, a position for which he was paid directly by the WCSO. The fact that Dr. Patnaude also has a private practice does not create liability on the part of WIM. See Ramos, 640 F.3d at 488.
Nelson seeks to distinguish Ramos on the grounds that a physician assistant from WIM performed an exam of Nelson on June 23rd and did not record his blood pressure on that date. The court sees no relevance in this observation to any facts in this case. On June 13, 14, and 17, 2005, Nelson’s blood pressure was checked and significantly elevated. Nelson refused Dr. Patnaude’s recommendation of medication on the 17th and apparently indicated that he would try to change his diet. On June 20th, Nelson’s blood pressure was checked again and similarly elevated. There is no suggestion in the record that anyone assumed that Nelson’s hypertension had improved between June 17th and 23rd. There is no suggestion that West’s physical exam of Nelson, which detected no other particular medical problem, was in any way erroneous. There is nothing in the summary judgment record to link West’s exam with the events of September 26, 2005. Summary judgment will enter dismissing the claims against WIM.
ORDER
For the foregoing reasons, Dr. Patnaude’s motion for summary judgment is DENIED as to Counts I and II and ALLOWED as to Count IV. WIM’s motion for summary judgment is ALLOWED.

Nelson also asserts a claim against the Worcester County Sheriffs Office, an agency of the Commonwealth of Massachusetts, for negligent supervision. That claim is not addressed in the pending motions.

Count II actually alleges a breach of express and implied warranties to render medical services according to accepted standards. Neither plaintiff nor defendants have suggested that G.L.c. 258, §2 does not apply to both counts in a uniform manner, and the court will treat both counts as asserting claims of negligence.

Dr. Patnaude’s reliance on Schenker v. Binns, 18 Mass.App.Ct. 404 (1984), and Florio v. Kennedy, 18 Mass.App.Ct 917 (1984), is also misplaced. In Schenker, the plaintiff never argues that the doctor was not a public employee, and, in Florio, summary judgment was affirmed because the plaintiff offered no factual support whatsoever for his contention that control and supervision was lacking. On the other hand, the court also notes that, in this case, Nelson’s brief spent much time pointing to the fact that Dr. Patnaude worked only part time for WCSO. That fact, in itself, is not particularly probative, as the definition of public employee in G.L.c. 258, §1 expressly includes part-time employees.

Nelson argues, although only in passing, that the court should not rule on Dr. Patnaude’s motion because, due to Dr. Patnaude’s current medical condition, Nelson has not been able to take Dr. Patnaude’s deposition. The court does not find that a sufficient showing under Mass.R.Civ.P. 56(f) has been made to delay mling on Dr. Patnaude’s motion to dismiss the §1983 claim. All others involved in Nelson’s care from September 13 to 26, 2005 were available for deposition, and there does not appear to be any factual dispute concerning the care Nelson actually received during that period. Nelson was screened on his arrival at the House of Corrections. Because of his elevated blood pressure, he was referred to Dr. Patnaude, who saw him promptly. Dr. Patnaude recognized the hypertension and recommended medication, which Nelson rejected, and a change in diet. Shortly after Nelson arrived at the infirmary on the evening of September 26th, Nurse Woods called Dr. Patnaude for advice. Dr. Patnaude ordered immediate medication and that vital signs be checked again in ten minutes. See Statement of Undisputed Facts 30-35, each of which Nelson admits.