WILLIE JOHNSON vs. ROBERT SUMMERS & another.[1]

Suffolk. March 6, 1991. - September 4, 1991.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Civil Rights*, Availability of remedy. *Due Process of Law*, Substantive rights, Police custody. *Constitutional Law*, Cruel and unusual punishment. *Proximate Cause. Negligence*, Police. *Regulation. Police*, Regulations.

In an action against two police officers seeking recovery under 42 U.S.C. § 1983 (1988), for violation of the plaintiff's civil rights, alleging that, while the plaintiff was in police custody, the defendants improperly delayed in providing him necessary medical assistance, there was sufficient evidence to permit the jury to find that certain police department regulations did not relieve the defendants of any constitutional obligation to attend to the plaintiff's serious medical needs, and that the defendants were purposely indifferent to those serious medical needs in violation of the plaintiff's rights to substantive due process of law under the Fourteenth Amendment to the United States Constitution. [86-87]

In an action against two police officers seeking recovery under 42 U.S.C. § 1983 (1988), for violation of the plaintiff's civil rights, alleging that, while the plaintiff was in police custody, the defendants improperly delayed in providing him necessary medical assistance, there was sufficient evidence to permit the jury's inferring and finding that the defendants' failure to bring the plaintiff directly to a hospital increased the likelihood that his serious injuries would be exacerbated, and that the defendants' conduct was a substantial factor in causing harm to the plaintiff. [88-89] LYNCH, J., dissenting, with whom NOLAN, & O'CONNOR, JJ., joined.

In an action against two police officers seeking recovery under 42 U.S.C. § 1983 (1988), for violation of the plaintiff's civil rights, alleging that, while the plaintiff was in police custody, the defendants improperly delayed in providing him necessary medical assistance, the defendants failed to meet their burden of proving the extraordinary circumstances required to entitle them to qualified immunity from suit. [89-90]

[1]Robert Nee.

CIVIL ACTION commenced in the Superior Court Department on July 20, 1983.

The case was tried before *Barbara J. Rouse*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Joseph L. Tehan, Jr.*, Assistant Corporation Counsel (*Gerard A. Pugsley*, Assistant Corporation Counsel, with him) for the defendants.

*Carmen L. Durso* (*Mark F. Itzkowitz* with him) for the plaintiff.

WILKINS, J. The defendants, Robert Summers and Robert Nee, Boston police officers, appeal following a Superior Court jury verdict awarding damages to the plaintiff Johnson under 42 U.S.C. § 1983 (1988), for the violation of Johnson's civil rights. In answer to special questions (Mass. R. Civ. P. 49, 365 Mass. 812 [1974]), the jury found that the defendants did not use excessive force or violate Johnson's constitutional rights in arresting him, but that, while Johnson was in police custody, the two officers improperly delayed in providing him necessary medical assistance. The judge denied the defendants' motions for a directed verdict and later denied their motion for judgment notwithstanding the verdict. In their appeal, which we transferred here, the defendants argue that the evidence warranted neither a finding that they violated Johnson's Federal constitutional rights nor a finding that their conduct caused Johnson's injuries. They also argue that they were entitled to immunity from suit. We affirm the judgment.

There was evidence from which the jury could have found the following. About 12:30 A.M. on July 21, 1981, Summers and Nee arrested Johnson at a three-family house in the Dorchester section of Boston where Johnson's girl friend lived.[2] At that time Johnson and Summers were standing on

---

[2]Johnson was arrested outside the door to his girl friend's apartment where he had been visiting that evening. After Johnson had left the apartment briefly, his girl friend locked him out of the apartment because, she testified, she wanted to go to sleep. Johnson forced the door open to retrieve belongings that he had left in the apartment. The girl friend notified

the second-floor landing, while Nee stood on the staircase four steps below the second floor. After Summers handcuffed Johnson, Johnson either was shoved (according to his own testimony) or fell (according to Summers's and Nee's testimony) down the staircase to the first floor. Johnson testified that he could not stand up after the fall and that he told the officers that they "broke [his] leg." Summers and Nee then picked Johnson up off the floor and dragged him out to the front porch. There Johnson again was shoved or slipped down a shorter flight of stairs to the sidewalk. Johnson testified that, as he lay on the sidewalk, he complained to the officers that he was in pain, could not stand up, and asked to be taken to a doctor. Summers and Nee dragged him to their cruiser and drove him approximately one-half mile to the police station.

As he was being removed from the cruiser at the station, Johnson again complained of pain in his leg and asked to be taken to a doctor. Summers and Nee dragged Johnson into the station, where he was placed in a cell and booked. Summers and Nee informed the booking officer of Johnson's injury. The officers then filled out the necessary reports and, their shift being over, went off duty at 1 A.M.

Some time later, another officer heard Johnson yelling in his cell and arranged for him to be taken to Boston City Hospital, where he arrived at 3:18 A.M. Johnson had a laceration to his right popliteal artery, the major artery to the lower leg, and a very severely comminuted fracture of the top of the tibia of his right leg. The laceration was caused by one or both of his falls. About 7:15 A.M. Johnson had an emergency operation because the lower leg can survive the loss of

the police of a breaking and entering, and, when officers Summers and Nee arrived, she also said that Johnson had attempted to rape her. The officers arrested Johnson. In an application for a criminal complaint in the District Court, Summers charged Johnson only with attempted breaking and entering. Johnson's girl friend admitted during the trial of this case that the accusation of rape was a fabrication. Johnson was convicted at a bench trial in Dorchester District Court of attempted breaking and entering, and claimed a jury trial. In the jury session the case was dismissed.

circulation for no more than approximately eight hours. The surgeons tried to repair the artery with a piece of vein from Johnson's left groin but were not able to obtain a good flow of blood. They then used a synthetic graft which was successful. Blood flow was restored about one hour after the operation began.

Because the blood flow to Johnson's lower leg had been shut off for approximately eight hours, the calf of this leg became massively swollen as new blood came into it. Special attention was given to the consequences of the swelling by slitting the tissues overlaying the swollen muscles, causing large open wounds on the front of his calf. At that point, the vascular surgeons consulted with the orthopedic surgeons and decided that any attempt to repair the tibia would seriously affect the artery.

Johnson had postoperative problems. Some of the skin grafts to cover the sites of the surgical wounds to his calf became infected. Because it was important to do so, the orthopedic surgeons had hoped to operate on Johnson promptly. The infections, however, delayed the operation on the tibia. On August 21, surgeons attempted a closed reduction of the fracture by manipulation but were not successful. An open reduction and internal fixation was no longer an available option because the bones had healed in an abnormal position. In October, Johnson had a knee fusion with the result that he can no longer flex his knee.

The jury found Summers and Nee liable in damages for the delay in providing medical care.[3] As we have said, the jury rejected Johnson's allegations that Summers and Nee used excessive force or assaulted and beat him. We, therefore, confine our analysis to the finding that the officers denied Johnson his civil rights by failing to provide him with medical care promptly.

---

[3]Johnson's complaint also named as defendants Summers's and Nee's supervising officers in the Boston police department and the city of Boston. A stipulation of dismissal without prejudice as to those defendants was filed after the trial of the claims against Summers and Nee.

The standard of review is whether, viewing the evidence in the light most favorable to the plaintiff, "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff." *Miga* v. *Holyoke*, 398 Mass. 343, 348 (1986). *Poirier* v. *Plymouth*, 374 Mass. 206, 212 (1978), quoting *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972).

1. A § 1983 plaintiff must demonstrate that (1) a person acting under color of State law committed the conduct complained of and (2) the conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Parratt* v. *Taylor*, 451 U.S. 527, 535 (1981). Summers and Nee were acting under color of law when they arrested Johnson, and they do not contend otherwise. Our inquiry focuses on whether the jury could reasonably have concluded that the defendants' conduct deprived Johnson of a federally protected right, privilege, or immunity.

The United States Supreme Court has held that "deliberate indifference to serious medical needs" of convicted prisoners violates the proscription of cruel and unusual punishment stated in the Eighth Amendment to the United States Constitution. *Estelle* v. *Gamble*, 429 U.S. 97, 104 (1976). That Court has also held that the constitutional rights of pretrial detainees are at least as broad as those afforded convicted prisoners. See *Bell* v. *Wolfish*, 441 U.S. 520, 545 (1979); *Miga* v. *Holyoke*, *supra* at 350-351. A detainee's Fourteenth Amendment due process right to medical care, therefore, is at least as great as the corresponding Eighth Amendment right of a prisoner. See *Revere* v. *Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983). See also *Miga* v. *Holyoke*, *supra* at 350-351. Thus, if a detainee establishes the "deliberate indifference to serious medical needs" that would constitute a violation of a prisoner's Eighth Amendment rights, he has necessarily shown conduct sufficiently culpable to constitute a violation of his due process rights.

The jury heard conflicting evidence as to the meaning of certain regulations of the Boston police department. In arguing that they violated no duty to Johnson, the defendants highlight portions of those regulations which, they claimed, required them to take Johnson directly to the station house without regard to his condition, and thereby relieved them of any responsibility for Johnson's medical needs. Other portions of the regulations, also before the jury, instead held the defendants "strictly responsible" for the plaintiff's well-being. Both defendants conceded that, at least in the case of serious, "visible" wounds, they would have had the discretion to take the plaintiff first to a hospital. Without passing on the relevancy of these regulations as to the existence of any duty under § 1983, we note that the jury would have been warranted in finding that, on these facts, the regulations did not relieve the defendants of any constitutional obligation to attend to the plaintiff's serious medical needs. See *Hall* v. *Ochs*, 817 F.2d 920, 925 n.2 (1st Cir. 1987). We shall return to these regulations when we discuss the defendants' claims of immunity.

There was sufficient evidence from which the jury could conclude that Summers and Nee were purposely indifferent to Johnson's serious medical needs.[4] The officers saw Johnson fall down two flights of stairs. He repeatedly made complaints about pain in his knee and requested medical attention several times. Johnson testified that he could not walk at all after the falls, an assertion that was bolstered by evidence that Johnson had broken his leg and severed an important artery. The officers themselves admitted that Johnson was unable to walk after his falls. The evidence warranted the jury's finding that the defendants wilfully or intentionally denied Johnson necessary medical care.[5]

---

[4] The defendants do not complain that the judge's charge allowed the jury to find them liable on some lesser standard of culpability.

[5] We note that, as the jury could have viewed the evidence, this is not a case in which police officers are being called to task for their negligent failure accurately to assess a latent physical ailment of unknown severity. Instead, the jury could have found that the police knew of the plaintiff's

2. We turn, therefore, to the causation issue. The Supreme Court has stated that § 1983 "creates a species of tort liability," *Imbler* v. *Pachtman,* 424 U.S. 409, 417 (1976), and that actions under the statute generally are governed by common law tort principles. See *Carey* v. *Piphus,* 435 U.S. 247, 257-259 (1978); *Imbler* v. *Pachtman, supra.* But see *Martinez* v. *California,* 444 U.S. 277, 285 (1980) (showing required to establish proximate cause under § 1983 may be more demanding than under State law). Accordingly, a showing of proximate causation is a necessary element in a § 1983 action. See *Daniels* v. *Gilbreath,* 668 F.2d 477, 480-481 (10th Cir. 1982); *Arnold* v. *International Business Machs. Corp.,* 637 F.2d 1350, 1355 (9th Cir. 1981). The defendants argue that there was no evidence from which the jury could have concluded that any delay attributable to them in providing medical care proximately caused or exacerbated his injuries. We disagree.

The question of causation is ordinarily for the jury. *Zezuski* v. *Jenny Mfg. Co.,* 363 Mass. 324, 328 (1973). "A plaintiff need only show 'that there was greater likelihood or probability that the harm complained of was due to causes for which the defendant was responsible than from any other cause.' " *Mullins* v. *Pine Manor College,* 389 Mass. 47, 58 (1983), quoting *McLaughlin* v. *Bernstein,* 356 Mass. 219, 226 (1969). It must be shown, however, that a defendant's negligent conduct is a "substantial factor" in bringing about harm to the plaintiff. Restatement (Second) of Torts § 431 (1965).

One theory of the plaintiff's case was that his knee had to be fused because of the delay in bringing him to the hospital. An expert witness testified at length about the complications created by that delay. The hospital records contain entries by two doctors indicating that the best method of correcting Johnson's comminuted fractures had to be postponed because

---

injuries, their severity, and the need for prompt medical care, and, hearing the plaintiff's repeated pleas for prompt medical attention, did nothing to aid him.

the delay in treatment made vascular repair "urgent." The necessity of treating the severed leg artery after such a delay, and the resulting complications of that treatment, therefore, prevented doctors from treating Johnson's fractured bones until several weeks had passed. By the time doctors were able to address the orthopedic damage, the bones in Johnson's leg had "healed in an abnormal position," and fusing the bones rather than repairing them was the only possible treatment.

The jury would have been warranted in inferring and finding that the defendants' failure to bring Johnson directly to a hospital increased the likelihood that his injuries would be exacerbated. The defendants' actions were not a minor ripple lost in a sea of competing causes, nor was the chain of causa- ..on so attenuated that, as a matter of law, the defendants' conduct could not have been a substantial factor in bringing about Johnson's harm. Restatement (Second) of Torts, *supra* at § 433 comments a-f (factors to be considered in determining whether negligent conduct is substantial factor in producing harm). See Restatement (Second) of Torts, *supra* at § 501 (2), stating that misconduct in reckless disregard of another's safety is to be taken into account in determining whether a jury case on causation has been made out.

3. The defendants claim that they were improperly denied the qualified immunity available to § 1983 defendants. Although we doubt that this issue was properly raised below and thus preserved for appeal, we nonetheless address it because our answer has no effect on the result. Both parties have argued the issue here, and the plaintiff does not argue that the issue was waived. The defendants do not urge that the contours of the relevant Federal law were insufficiently clear so that a reasonable officer would not have understood that what the defendants did was in violation of the plaintiff's constitutional rights. See *Anderson* v. *Creighton*, 483 U.S. 635, 638-641 (1987); *Harlow* v. *Fitzgerald*, 457 U.S. 800, 818 (1982). Instead, the defendants rely on their adherence to the department's regulations which, they assert, absolved them of any responsibility for the plaintiff's care.

Summers and Nee might prevail on their immunity claim if they could "prove that [through 'extraordinary circumstances'] [they] neither knew nor should have known of the relevant legal standard." See *Harlow* v. *Fitzgerald, supra* at 819. There is some, though hardly unanimous, authority that the fact that an actor was following a superior's orders should be considered in determining whether a § 1983 defendant should be immunized from liability for the violation of a plaintiff's otherwise clear Federal rights. See 1 Schwartz, Kirklin, Section 1983 Litigation: Claims, Defenses, and Fees § 9.16, at 527 n.450 (2d ed. 1991). We have already noted, however, that the jury could properly have viewed the department's regulations as placing no constraints on the ability of the defendants to provide prompt medical care. The defendants have not met their burden of proving extraordinary circumstances and are not entitled to qualified immunity from suit.

4. The defendants argue that the imposition of liability here would upset the effective functioning of vital law enforcement personnel. Concerns of that type have been addressed by the recognition of qualified immunity for such personnel (see *Anderson* v. *Creighton, supra* at 638) and by the high level of culpability which a § 1983 plaintiff must show before liability will be imposed. We are aware of no authority that would allow us to discover some additional Federal immunity in the name of public policy. In any event, we see no burden on legitimate law enforcement needs that will result from allowing the judgment below to stand.[6]

*Judgment affirmed.*

LYNCH, J. (dissenting, with whom Nolan and O'Connor, JJ., join). There is not a trace of evidence in the record sug-

---

[6]The defendants moved for a new trial as an alternative to their motion for the entry of judgment notwithstanding the verdict. They advance no separate argument concerning the denial of that motion. There was no error in its denial.

gesting that delay in providing medical care to the plaintiff
caused him to be crippled. The evidence indicates only that
by 3:18 A.M., when he finally arrived at the hospital, his con-
dition was such that his orthopedic injuries could not be
treated until much later which resulted in loss of function to
his knee. Would the plaintiff's leg have healed more success-
fully if he had been taken to the hospital at 2 A.M.? At 1:30?
Or was the medically significant delay the half hour between
12:30, when the defendants arrested the plaintiff, and 1 A.M.,
when the defendants went off duty and ceased to be responsi-
ble for the plaintiff's care? Or, indeed, would the result have
been the same if the plaintiff had arrived at the hospital one
minute after he was injured? The jury's answer amounts to a
guess because the record contains no hint. Given the plain-
tiff's absolute failure to introduce any evidence establishing a
causal link between the defendants' conduct and the plain-
tiff's worsened condition, the defendants were entitled to a
directed verdict or judgment notwithstanding the verdict.

It is fundamental that the plaintiff bears the burden of es-
tablishing causation by a preponderance of the evidence. "If
on all the evidence it is just as reasonable to suppose that the
cause [of the plaintiff's injuries] is one for which no liability
would attach to the defendant as one for which the defendant
is liable, then a plaintiff fails to make out his case." *Alholm*
v. *Wareham*, 371 Mass. 621, 627 (1976), quoting *Bigwood* v.
*Boston & N. St. Ry.*, 209 Mass. 345, 348 (1911).

The plaintiff cannot escape a directed verdict or judgment
notwithstanding the verdict if no view of the evidence sup-
ports a verdict in his favor. See *Stapleton* v. *Macchi*, 401
Mass. 725, 728 (1988).[1] Although we indulge every inference
to his advantage, *Wilson* v. *Honeywell, Inc.*, 409 Mass. 803,
804 (1991), the plaintiff is nonetheless required to establish
the essential elements of his claim "either by direct evidence
or rational inference of probabilities from established facts."

---

[1]The standards governing motions for directed verdict and judgment
notwithstanding the verdict are the same. *Stapleton* v. *Macchi*, 401 Mass.
725, 728 n.5 (1988).

*Zezuski* v. *Jenny Mfg. Co.*, 363 Mass. 324, 329 (1973), quoting *Bigwood, supra.* Inferences drawn from the evidence must be based on probabilities, not possibilities. *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. 659, 664 (1981). *Alholm, supra.* That is, inferences may not be drawn "from the realm of mere speculation and conjecture." *Id.* Contrary to this standard, today's ruling endorses an attenuated inference lacking an essential factual predicate.

The court states that "[a]n expert witness testified at length about the complications created by that delay," that is, "the delay in bringing [the plaintiff] to the hospital." *Ante* at 88. The expert explained that the defendant suffered fractured and dislocated bones in and near his knee and a severed artery when he fell down the two sets of stairs. He testified that the necessity of treating the severed artery immediately and complications in treating the plaintiff's open wounds led the doctors to postpone addressing the orthopedic damage in his knee.[2] According to the expert, by August 25, 1981, one month after the incident, the bones had fused in a "malunion," which prevented the doctors from restoring the knee surgically.[3] On October 19, 1981, doctors operated on

---

[2]The expert testimony on which the plaintiff and presumably the court relies recounted the treatment the plaintiff received on the day of the incident. He noted that the popliteal artery, the major artery carrying blood to the lower leg, had been severed. He continued, "[O]n an emergency basis, [the plaintiff] was immediately taken to the operating room to have [the artery] repaired." When asked how the doctors treated a broken bone at this point, the expert responded, "Well, there are several things wrong that were emergencies, even over and above the broken tibia. Once the artery is repaired, blood flow is restored to the leg." Once the doctors treated swelling that resulted from the restoration of blood flow to the leg, the expert said, "the vascular surgeons, in consultation with the orthopedic surgeon . . . decided that any further operative repair or attempt to repair of the tibia bone would seriously affect the artery, and, in fact, might disrupt the flow of the artery. So, at that point, they did something which is also standard practice in orthopedics. They placed a pin through the upper tibia. So, we take a pin and put it through the bone, and we put the person in traction. . . . [T]hey had restored blood flow to the leg. Essentially, nothing had been done with his fractures at that point, other than traction."

[3]The doctor testified, "At that point [August 25, 1981], the bones are fused together enough that we consider it a malunion. What that means is

the knee, joining the femur (thigh bone) and tibia (a shin bone) in a fixed position, essentially eliminating the knee joint.

In sum, the expert opined only that at 3:18 A.M. it was necessary to delay treatment of the plaintiff's fractured bones. The hospital records admitted in evidence add nothing more.[4] Nowhere in the expert's testimony is there a statement, either express or implied, that the procedure followed at the hospital, or the result, would have been different had the plaintiff been brought to the hospital immediately after he sustained his injuries. Although one may infer that the plaintiff would have obtained medical care sooner if the defendants had taken him directly to the hospital, there was no evidence to suggest that the treatment rendered at that unknown earlier time would have been any more effective. Surely the testimony that complications arose from the fact that his blood supply had not been restored for at least eight hours does not imply that lack of blood flow for five or six hours would not have led to the same conditions.

Furthermore, even if we assume, for purposes of analysis, that the three hours before the plaintiff's arrival at the hospital were medically significant, the evidence still is critically lacking. The plaintiff failed to offer *any* evidence suggesting that the period of delay for which the defendants were arguably responsible, from 12:30 to 1 A.M., caused the plaintiff's condition to worsen. Remarkably, this reduces to irrele-

---

the bones have healed in an abnormal position, and open reduction and internal fixation is no longer a viable option."

[4]The hospital records contain two relevant notations, both dated July 21, 1981. First, the chief resident noted, "ORIF [open reduction and internal fixation, i.e., orthopedic surgery] would give best result but ischemic time makes vascular repair urgent." A second doctor stated, in a postoperative report: "Because of the previous 8 hour ischemic time to the leg, it was felt that an additional 3 hour procedure to reconstruct the tibial plateaus in this patient was not indicated at this time." These notations do not address the decisive issue: Would doctors have achieved a better result if the ischemic time had been briefer? Furthermore it should be noted that the plaintiff's expert attached no significance to these notes. Nothing suggests that this medical expert construed those notes in the way the court says the inexpert jury fairly could have construed them.

vance the question whether the delay that occurred while the plaintiff remained in the defendants' custody was medically costly.

With due respect, I, therefore, dissent.