Brassard, J.
The estate of Diane O’Brien filed the present action against the defendant Kennard Kobrin, a psychiatrist at the John C. Corrigan Mental Health Center, alleging wrongful death and civil rights violations in connection with O’Brien’s suicide on July 14, 1993. This matter is before the court on the defendant’s motion for summary judgment pursuant to Mass.R.Civ.P. 56. For the reasons discussed below, the defendant’s motion is DENIED.
BACKGROUND
The undisputed facts as revealed by the summary judgment record are as follows. On July 9, 1993, Diane O’Brien (O’Brien), a thirty-five-year-old mother of three, was involuntarily committed as a substance abuser to the Stanley Street Treatment & Resources Rehabilitation Program (SSTAR) by the Taunton District Court pursuant to G.L.c. 123, §35. (Commitment Petition.) O’Brien was addicted to cocaine and barbituates, had stolen checks from her parents in order to obtain drugs, and was focused on attempts to obtain prescription medications. (Commitment Petition.) In addition, O’Brien was depressed, had been raped a week prior, and had recently made numerous suicide attempts and suicide threats.
On July 11, 1993, O’Brien reported to the SSTAR nursing staff that she was suicidal and was hearing a man’s voice stating that he was going to kill her. SSTAR’s procedure when a patient appeared suicidal was to send the patient to a secure facility such as the John C. Corrigan Mental Health Center (Corrigan), a Department of Mental Health facility located in Fall River. (Garvey Depo. p. 202.) SSTAR contacted Corrigan and requested a psychiatric evaluation of O’Brien “for safety.” (SSTAR Request.) Corrigan Outreach Worker Kathleen Frias (Frias) went to SSTAR to evaluate O’Brien. Frias observed that O’Brien was anxious, crying and sobbing. O’Brien stated that she was hearing voices, that the voices were driving her crazy, and she couldn’t take it anymore. (Frias Interview Notes; Price Letter p.2; OIA Report p.13.) Frias noted that O’Brien was not in control of the voices and that if they intensified, she might hurt herself by acting out on them. (Frias Interview Notes.) Frias concluded that O’Brien should be evaluated by a psychiatrist for suicidaliiy and medication for the auditory hallucinations and a possible inpatient hospitalization. (Frias Depo. p. 137; Faria Depo. p. 26.) Accordingly, O’Brien was transported to Corrigan for a risk assessment evaluation. (Farrelly Depo. p. 4; OLA Report p. 14.)
Corrigan’s mandate was .to examine the patient, determine what treatment was required, and ensure the patient’s safety using the least restrictive measure possible. (Farrelly Depo. p. 32.) Daphne Saalmon (Saalmon) was the Crisis Clinician on duty at Corrigan on July 11, 1993. Saalmon, who had a masters degree in social work, had graduated from school in 1992 and had only been employed at Corrigan since June of 1993. (Farrelly Depo. p. 37; Moss Depo. pp. 13- 14.) Based on the information received by Frias, Saalmon believed that O’Brien should be evaluated by a psychiatrist. (Faria Depo. pp. 71-72.) However, it was beyond Saalmon’s level of skill and training to assess O’Brien’s suicidality and make a determination as to whether she required hospitalization. (Farrelly Depo. pp. 38-39.)
Saalmon telephoned the psychiatrist on call, Dr. Kennard Kobrin (Kobrin) and told him that Frias believed O’Brien might need admission to the hospital. (Haltzman Depo. p. 51; OIA Report p. 14.) Kobrin informed Saalmon that it was SSTAR’s responsibility to provide O’Brien with psychiatric services and that he could not admit O’Brien under G.L.c. 123, §12 because she was currently committed to SSTAR as a substance abuser under c. 123, §35. (Haltzman Depo. pp. 51-52; Price letter p. 3.) Although Saalmon told Kobrin that §35 patients had been admitted to Corrigan in the past, he insisted that such admission would be illegal. In fact, Kobrin was mistaken and such a hospitalization was legally possible. (Isaacson Letter 7/27/93.) Kobrin had worked for some time in forensic mental health, including at Bridgewater State Hospital, and was considered to have expertise in forensic mental health issues as well as in-depth knowledge of the policies and application of §35 and the interplay between §§12 and 35. (Haltzman Depo. p. 128.) Kobrin later admitted to Department of Mental Health Investigator David Faria that he could in fact have hospitalized O’Brien under §12 if necessary. (Faria Depo. pp. 23-24.)
Kobrin was required to make a determination about whether he needed to examine the patient in person, or whether to give phone orders or other consultation *595 to the crisis clinician. (Farrelly Depo. p. 36.) He would be legally required to come to the hospital for an in-person psychiatric evaluation of a patient if there were a court order for apprehension or in the case of a G.L.c. 123, §12 admission. (Faria Depo. pp. 12-13.) Kobrin decided not to come to Corrigan to evaluate O’Brien in person. Kobrin suggested that Saalmon evaluate O’Brien and then call him back for evaluation. (Price letter p. 3; OIA Report p. 15.)
Saalmon met with O’Brien for approximately half an hour and conducted a mental status assessment. (Haltzman Depo. p. 40; Farrelly Depo. p. 30.) Saalmon noted that O’Brien presented with visible psychomotor agitation, shaking; that she had a history of depression and was presently feeling depressed. (Farrelly Depo. pp. 35-36; Screening Instrument pp. 3-4.) Saalmon noted that O’Brien had expressed a desire to kill herself by hanging earlier in the day, but stated that she did not presently feel suicidal. (OIA Report p. 15.) When Saalmon asked O’Brien about her auditory hallucinations, O’Brien stated that she had been hearing a man’s voice stating, “I’m going to kill you.” (Farrelly Depo. p. 52.) However, O’Brien denied hearing voices at that moment and stated that SSTAR had decreased her Klonopin which she needed to help control the voices. (OIA Report p. 16.) Saalmon noted that O’Brien was focused on a recent rape and was seeking medication. (Screening Instrument p. 4.) Saalmon believed that O’Brien could contract for her safety and let staff know if she were feeling suicidal. (Price letter p. 3; Screening Instrument p. 5.) O’Brien agreed to contract for her safely. (OIA Report p. 16.)
Saalmon then consulted with Kobrin by telephone, informing him of what transpired in the interview and that O’Brien had contracted for safety. (OLA Report p. 16.) Kobrin believed that O’Brien did not require hospitalization and told Saalmon that he felt medication was the issue. (OIA Report p. 16.) The staff physician at SSTAR had ordered that O’Brien’s Klonopin be tapered off. (Faria Depo. p. 67.) Kobrin spoke to the charge nurse at SSTAR, who stated that O’Brien had indicated that she did not want her Klonopin further decreased and that in the past, Thorazine had been helpful in controlling her auditory hallucinations. (Haltzman Depo. p. 50.) Kobrin believed that the best way to address the auditory hallucinations was to increase O’Brien’s Thorazine; however, he also had some concern that O’Brien was seeking medication, because Klonopin, a substance similar to valium, would not affect the hallucinations. (Faria Depo. pp. 145-46.) Ultimately, Kobrin recommended that O’Brien receive a dose of 50 milligrams of Thorazine and that she not be tapered any further off her Klonopin. (Haltzman Depo. p. 50.)
O’Brien was then transported back to SSTAR. The staff at SSTAR had received information from Corrigan that O’Brien was “med-seeking” and that it was safe for her to return to SSTAR. (Ward Depo. p. 48.) A SSTAR physician, Scott Haltzman (Haltzman), increased O’Brien’s dosage of Thorazine but reduced her dosage of Klonopin, apparently unaware of Kobrin’s instructions to maintain it. (O’Brien Inter. 4; Ward Depo. p. 48.) The following day, July 12, Frias spent approximately 15 minutes with O’Brien. She was surprised to see O’Brien at SSTAR because she believed that O’Brien was going to be admitted to Corrigan. (Frias Depo. pp. 97-98.) O’Brien reported that she was extremely anxious, depressed, and upset that her Klonopin was being reduced. (O’Brien Inter. 4.) On July 14,1993, O’Brien was extremely anxious and told staff she needed medication and “couldn’t take it anymore.” (Police Report.) That same day, O’Brien committed suicide by hanging herself on the shower curtain rod in a bathroom at SSTAR. (Autopsy Report.)
Thereafter, on July 5, 1996, O’Brien’s estate filed the present wrongful death action against Haltzman and SSTAR. On May 11, 1999, the estate moved, without opposition, to amend its complaint to add claims against Kobrin, and the motion was allowed on May 18. Count I of the amended complaint alleges negligence against Haltzman, Count II alleges negligence against SSTAR, Count III alleges negligence against Kobrin, and Count IV alleges that Kobrin violated 42 U.S.C. §1983. The estate settled its claims against Haltzman and SSTAR and in June of 1999, the estate stipulated to the dismissal with prejudice of Counts I and II of the complaint.
Kobrin was employed by the Commonwealth of Massachusetts Department of Mental Health at its Corrigan facility as a Psychiatrist III from July of 1987 until January of 1998. (Kobrin Aff. 1.) Kobrin wás paid a fixed salary by the Department of Mental Health. (Kobrin Aff. 9.) He was supervised by the Medical Director, who completed an annual Employee Performance Review Form rating Kobrin’s performance. (Personnel Form; Performance Review Form; Kobrin Aff. 4.) In being appointed to Corrigan’s medical staff, Kobrin agreed to abide by all facility and staff rules and regulations as were from time to time enacted. He was also subject to the policies and procedures of the Department of Mental Health. (Corrigan Medical Staff Membership; Kobrin Aff. 3.) However, Kobrin was not required to consult with the Clinical Director of Crisis Services or the Medical Director with respect to his decision not to personally evaluate O’Brien. (Haltzman Depo. pp. 126-27.) Kobrin worked regular shifts at the Medical Clinic and had scheduled days off, which were determined by DMH’s Area Directors and Facility Directors. (Personnel Action Form; Kobrin Aff. 5.) The Area and Facility Directors determined when he was on call and what hours he had to be available. (Kobrin Aff. 7.) Kobrin treated those patients who were given an appointment during his shift; he was not responsible for scheduling patients’ appointments. (Kobrin Aff. 6.) Kobrin retired from the Commonwealth of Massachusetts on January 25, 1998 and currently *596 receives a state pension. (Board of Retirement Form; Kobrin Aff. 10.)
DISCUSSION
Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
Kobrin first contends that he is entitled to summary judgment on Count III of the complaint on the ground that he is immune from personal liability for his alleged negligence under the Massachusetts Tort Claims Act. General Laws Chapter 258 establishes governmental immunity within certain limits, making the government and its subsidiaries liable for the negligence of its employees, while ensuring personal immunity for individuals working within the government and acting within the scope of their duties. G.L.c. 258, §2 (1978); Pruner v. Clerk of the Superior Court, 382 Mass. 309, 315 (1981). While the statutory definition of “public employee” is unhelpful,[1] the definition of a “public employer” provides guidance in determining whether a person is a public employee. Kelley v. Rossi, 395 Mass. 659, 661 (1985). “Public employer” is defined in relevant part as:
the commonwealth and any county, city, town . . . and any department, office, commission, committee, council, board, division, bureau, institution, agency or authority thereof . . . which exercises direction and control over the public employee. G.L.c. 258, §1 (1999).
Thus, the test for determining whether an individual is a public employee is the same as that used to establish whether an agent is a servant for whose negligence a principal may be liable under the common law doctrine of respondeat superior. McNamara v. Honeyman, 406 Mass. 43, 48 (1989). The fact that an agency such as the Department of Mental Health is a “public employer” for purposes of Chapter 258 does not automatically establish that all its employees are public employees. See McNamara v. Honeyman, 406 Mass. at 48. Rather, whether an individual is a public employee is generally a question of fact. Williams v. Hartman, 413 Mass. 398, 400 (1992).
The SJC has noted that the very nature of a physician’s function tends to suggest that in most instances, a physician will act as an independent contractor rather than as a public employee. Williams v. Hartman, 413 Mass. at 400-01; Kelley v. Rossi, 395 Mass. at 662.[2] However, the court has also rejected the proposition that a physician can never be a public employee under Chapter 258, noting that although physicians exercise independent judgment, a physician may be deemed a servant where the principal controls the details of the physician’s activities. McNamara v. Honeyman, 406 Mass. at 48; Kelley v. Rossi, 395 Mass. at 661-62. “A physician is not necessarily a public employee simply because a public entity pays his or her salary, provides a retirement fund, or manages a vacation schedule.” Williams v. Hartman, 413 Mass. at 400. Relevant considerations include whether the physician controls his own hours and work schedule, whether he determines which patients he will treat, and whether his compensation is fixed or based on productivity. Hopper v. Callahan, 408 Mass. 621, 635 (1990); McNamara v. Honeyman, 406 Mass. at 48; Smith v. Steinberg, 395 Mass. 666, 669 (1985).
In addition, the court will examine whether a public employer directs and controls the physician’s day to day activities and the physician’s treatment of the patient. Williams v. Hartman, 413 Mass. at 400-01; Smith v. Steinberg, 395 Mass. at 668. See Kelley v. Rossi, 395 Mass. at 664 (noting that the proper focus was on whether a doctor was subject to the city’s control while working in the hospital emergency room, where the alleged negligence occurred). Under this analysis, a resident of a public hospital is generally a servant, and thus a public employee, because residents are closely supervised on a daily basis in their treatment of patients and have no ability to select patients or admit them to the hospital. Williams v. Hartman, 413 Mass. at 401 n. 4; Kelley v. Rossi, 395 Mass. at 663; Williams v. Bresnahan, 27 Mass.App.Ct. 191, 192-93, rev. den., 405 Mass. 1202 (1989).
In the present case, although Kobrin was required to abide by Corrigan’s facility and staff rules and regulations, as well as various policies and procedures of the Department of Mental Health, such rules, regulations and policies are not in evidence, and it is not clear to what extent they direct Kobrin’s day to day activities. Further, although Kobrin was supervised by the Medical Director, who completed an annual Employee Performance Review Form rating Kobrin’s performance, the record is devoid of evidence concerning the degree to which such supervision controlled the details of Kobrin’s treatment of patients such as O’Brien. Finally, although Kobrin was required to treat *597 any patient scheduled for an appointment while he was on call, it is undisputed that he was not required to consult with the Clinical Director of Crisis Services or the Medical Director with respect to his decision not to evaluate O’Brien in person. Thus, the present record reveals a genuine issue of material fact with respect to whether Corrigan had direction and control over Kobrin’s activities at the time he treated O’Brien. See Williams v. Hartman, 413 Mass. at 401 (concluding that there was a genuine issue of material fact as to whether a psychiatrist who was the director of the Solomon Carter Fuller Mental Health Center was a public employee where there was evidence that no one directed his day to day activities, he alone made medical decisions in connection with treating his patients, and he set his own work schedule); Maloney v. Herrmann, 1998 Mass. Super. LEXIS 319 (concluding that there was a genuine issue of material fact as to the public employee status of an attending physician at the University of Massachusetts Medical Center where although the physician had his work schedules and rotations set, and his performance reviewed annually, by a Division Chief; did not have discretion to refuse a patient presented to him at the hospital; and was required to abide by the policies, rules and regulations set by the Hospital Board of Trustees; he had discretion whether or not to admit patients to the Hospital and made the final judgments on the treatment and care of his patients). Compare Florio v. Kennedy, 18 Mass.App.Ct. 917, 918-19 (1984) (granting summary judgment on the ground that a physician was immune from liability as a public employee where the record showed that the physician was employed at Worcester State Hospital, received a fixed weekly salary, worked a set forty hours a week and attended only patients assigned by the hospital, and the plaintiff failed to introduce admissible evidence that the hospital did not control his daily medical duties).
Accordingly, Kobrin is not entitled to judgment as a matter of law on Count III of the complaint on the ground that he is a “public employee” immune from personal liability under G.L.c. 258, §2.
Kobrin further moves for summary judgment on Count IV of the complaint asserting a civil rights claim pursuant to 42 U.S.C. §1983. To establish such a claim, a plaintiff must show that the defendant, acting under color of State law, deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States. McNamara v. Honeyman, 406 Mass. at 52. The estate asserts that Kobrin deprived O’Brien of her Due Process rights under the Fourteenth Amendment.[3] Individuals who are involuntarily committed to a state mental health facility have a right under the Fourteenth Amendment to the United States Constitution to adequate medical care. Williams v. Hartman, 413 Mass. at 403. When the state deprives an individual of her liberty by taking her into custody and holding her there against her will, it assumes responsibility for her safety and well-being. County of Sacramento v. Lewis, 523 U.S. 833 (1998); Youngberg v. Romeo, 457 U.S. 307, 315 (1982); Williams v. Hartman, 413 Mass. at 403.
It is well established, however, that the Fourteenth Amendment is not implicated by the ordinary negligence of a physician. Hopper v. Callahan, 408 Mass. at 627; McNamara v. Honeyman, 406 Mass. at 53. Kobrin contends that he is entitled to summary judgment because the estate will be unable to demonstrate at trial that his failure to conduct a personal psychiatric evaluation of O’Brien constituted deliberate indifference to her medical needs. Deliberate indifference is the equivalent of criminal recklessness, a conscious disregard of an excessive risk of harm to an individual’s health or safety requiring actual knowledge or wilful blindness. Manarite v. City of Springfield, 957 F.2d 953, 956 (1st Cir.), cert. den., 506 U.S. 837 (1992). However, persons who have been involuntarily committed are entitled by the Fourteenth Amendment to more considerate treatment and conditions of confinement than convicted criminals, to whom the deliberate indifference standard applies. Youngberg v. Romeo, 457 U.S. at 322; Hopper v. Callahan, 408 Mass. at 627. As to involuntarily committed patients, liability may be imposed when the physician’s decision is such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the physician actually did not base the decision on such a judgment. Youngberg v. Romeo, 457 U.S. at 323; Hopper v. Callahan, 408 Mass. at 627. Liability thus may be based on gross negligence or conscious indifference involving no application of professional judgment at all. Hopper v. Callahan, 408 Mass. at 627.
In the present case, Kobrin arguably exercised his professional judgment in concluding that he could not admit O’Brien under G.L.c. 123, §12 because of her commitment under §35, although he was incorrect and perhaps negligent in his conclusion. Nonetheless, there is a genuine issue of material fact with respect to whether despite his belief that he could not admit O’Brien, he was grossly negligent in failing to personally evaluate her for safely, abdicating responsibility for evaluating her suicidality to an inexperienced social worker who lacked the skill and training to do so. See Hopper v. Callahan, 408 Mass. at 630-31 (concluding that there was genuine issue of material fact as to whether physicians who placed a psychotic patient in seclusion without examining her had been grossly negligent, failing to exercise professional judgment, and had abdicated their responsibility for investigating her medical condition to inadequately trained staff); Gilbert v. Texas Mental Health & Mental Retardation, 919 F.Sup. 1031, 1039-40 (E.D. Tex. 1996) (concluding that there was a genuine issue of material fact with respect to whether a psychologist violated *598 §1983 by relying on the judgment of non-professionals, which endangered the patient and was inconsistent with the exercise of professional judgment). Compare Cameron v. Torres, 783 F.Sup. 1511, 1522 (D. Mass. 1992), injunction modified, 990 F.2d 14 (1st Cir. 1993) (concluding that the decision to leave an involuntarily committed patient in a high security program constituted the failure to exercise professional judgment where it was based on exigency, administrative convenience and other non-medical criteria).
To succeed on his motion for summary judgment, Kobrin bears the burden of demonstrating, without dispute of material fact, that he was not grossly negligent amounting to a failure to exercise professional judgment. See Hopper v. Callahan, 408 Mass. at 633 (denying summary judgment where the defendant failed to introduce an expert affidavit or uncontro-verted facts showing that he met the constitutional standard). The present summary judgment record does not conclusively demonstrate that Kobrin was no more than simply negligent. Rather, a jury could reasonably find that Kobrin’s actions in failing to personally evaluate a suicidal patient was such a substantial departure from the standards of the psychiatric profession so as to constitute a failure to exercise professional judgment sufficient to impose liability under 42 U.S.C. §1983.
Kobrin further contends that the estate will be unable to demonstrate that O’Brien’s suicide three days after returning to SSTAR was the result of his alleged failure to exercise his professional judgment. It is well established that a showing of proximate causation is a necessary element of a §1983 action. Johnson v. Summers, 411 Mass. 82, 88 (1991), cert. den., 502 U.S. 1093 (1992). The plaintiff need only show that there was a greater likelihood or probability that the harm complained of was due to causes for which the defendant was responsible than from any other cause. Johnson v. Summers, 411 Mass. at 88; Mullins v. Pine Manor College, 389 Mass. 47, 58 (1983). The defendant’s negligent conduct must be a substantial factor in bringing about the harm to the plaintiff Johnson v. Summers, 411 Mass. at 88. In the present case, the estate has proffered the expert opinion of Dr. Floyd Price that, to a reasonable degree of medical certainty, Kobrin’s failure to evaluate O’Brien in person substantially contributed to her suicide. This is sufficient to survive summary judgment. See McNamara v. Honeyman, 406 Mass. at 51 (concluding that expert testimony that suicide of hospitalized patient could have been prevented by one-on-one observation was sufficient to allow an inference that a physician’s negligence in placing her on fifteen-minute checks was the proximate cause of her death). Thus, Kobrin is not entitled to judgment as a matter of law on Count IV of the complaint.
Finally, Kobrin contends that he is entitled to summary judgment on the ground that the estate failed to file its civil rights claim within the relevant statute of limitations. A claim under 42 U.S.C. §1983 is governed by the three year statute of limitations for personal injury actions set forth at G.L.c. 260, §2A. Pagliuca v. Boston, 35 Mass.App.Ct. 820, 822 (1994). In the present case, the estate did not seek to file its amended complaint asserting the civil rights claim against Kobrin until May of 1999, almost six years after O’Brien’s death. This Court allowed the motion to amend on May 18, 1999, and pursuant to Mass.R.Civ.P. 15(c), the amendment related back to the original pleading, which was timely filed.
Nonetheless, Kobrin claims that the relation back of an amendment of a complaint alleging a violation of federal law is governed by federal, rather than state, rules of civil procedure, citing Pessotti v. Eagle Mfg. Co., 774 F.Sup. 669 (D. Mass. 1990), aff'd, 946 F.2d 974 (1st Cir. 1991). The Pessotti case, however, involved a diversity action in which the U.S. District Court concluded that under the principles set forth in Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938), the relation back of an amendment was a procedural rather than substantive rule, such that Federal Rule of Civil Procedure 15(c), rather than Massachusetts Rule 15(c), controlled. Pessotti v. Eagle Mfg. Co., 774 F.Sup. at 678-79. Pessotti does not stand for the proposition that in a state court action, amendment of a complaint to add a federal statutory claim is governed by the Federal Rules of Civil Procedure. Accordingly, Kobrin is not entitled to judgment as a matter of law on Count IV of the complaint based on the statute of limitations.
ORDER
For the foregoing reasons, it is hereby ORDERED that the defendant’s motion for summary judgment be DENIED.

 “Public employee” is defined, in relevant part, as “elected or appointed, officers or employees of any public employer, whether serving full or part-time, temporary or permanent, compensated or uncompensated . . ." G.L.c. 258, §1 (1999).

 As explained by Judge Fecteau, “one can distill the Court’s unwillingness to immunize physicians simply because they are employed by a state agency. The Court has recognized that in terms of patient care, a doctor is rarely supervised to a degree that would warrant holding the employer liable.” Maloney v. Herrmann, 1998 Mass. Super. LEXIS 329.

 The parties' briefs also refer to the Eighth Amendment. It is well established that deliberate indifference to the serious illness or injury of prisoners violates the Eighth Amendment. Miga v. Holyoke, 398 Mass. 343, 349 (1986). However, the Eighth Amendment prohibitions against cruel and unusual punishment apply only to those in custody following an adjudication of guilt, and not to pretrial detainees or presumably, those who have been civilly committed. See Id. at 350. As to such individuals, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment. Id.